## BARTHOLOMEY v. STATE OF MARYLAND

[No. 106, September Term, 1970.]

* * *

## JOYNER v. STATE OF MARYLAND

[No. 386, September Term, 1971.]

* * *

## ARRINGTON v. STATE OF MARYLAND

[Misc. No. 2, September Term, 1972.]

* * *

## STERLING v. STATE OF MARYLAND

[Misc. No. 3, September Term, 1972.]

*Decided December 4, 1972.*

176

The causes were argued before MURPHY, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and LEVINE, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals (now Chief Judge of the Court of Special Appeals), specially assigned.

*Alan H. Murrel, Public Defender,* with whom were *Elsbeth Levy Bothe* and *Arnold M. Zerwitz, Assistant Public Defenders,* on the brief, for appellants in No. 106, Misc. No. 2 and Misc. No. 3.

*R. Kenneth Munday,* with whom was *Joseph L. Gibson, Jr.,* on the brief, for appellant in No. 386.

*Francis B. Burch, Attorney General,* with whom were *Edward F. Borgerding* and *Clarence W. Sharp, Assistant Attorneys General,* on the brief in No. 106, Misc. No. 2 and Misc. No. 3, and *David B. Allen, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert W. King, Assistant State's Attorney for Prince George's County,* on the brief in No. 386, for appellee.

MURPHY, C. J., delivered the opinion of the Court. BARNES and SMITH, JJ., dissent; BARNES, J., filed a dissenting opinion in which SMITH, J., concurs at page 197 *infra* and SMITH, J., filed a dissenting opinion at page 221 *infra.*

# I

On December 8, 1968, in the course of escaping from lawful confinement in the Wicomico County jail, Joseph James Bartholomey shot and killed two peace officers. He was found guilty by a jury on two counts of murder in the first degree, and the court thereafter imposed sen-

tences of death upon each conviction. We affirmed the judgments on appeal, *Bartholomey v. State,* 260 Md. 504, 273 A. 2d 164 (1971), holding, among other things, that imposition of the death sentence for first degree murder, authorized by Maryland Code (1957 Ed.), Article 27, § 413,[1] violated neither the federal nor State constitutions. Bartholomey petitioned for a writ of certiorari in the Supreme Court of the United States, claiming that his death sentences constituted cruel and unusual punishment in violation of the Eighth Amendment to the federal constitution made applicable to the states through the Fourteenth Amendment.

On June 29, 1972, the Supreme Court of the United States, in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas, sub nom. Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), *reh. den.* 409 U. S. 902, 93 S. Ct. 89, 34 L.Ed.2d 163 (1972), considered the question whether death sentences imposed under discretionary statutes upon two defendants convicted of rape and one convicted of murder in the first degree violated the Eighth and Fourteenth Amendments to the federal constitution. By a divided (5-4) per curiam decision, the Court concluded:

> ". . . that the imposition and carrying out of the death penalty in these cases constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The judgment in each case is therefore reversed insofar as it leaves undisturbed the death sentence im-

---

1. "Every person convicted of murder in the first degree . . . shall suffer death, or undergo a confinement in the penitentiary of the State for the period of their natural life, in the discretion of the court before whom such person may be tried; provided, however, that the jury in a murder case . . . may add thereto the words 'without capital punishment,' in which case the sentence of the court shall be imprisonment for life, and in no case where a jury shall have rendered a verdict in manner and form as hereinbefore prescribed, 'without capital punishment,' shall the court in imposing the sentence, sentence the convicted party to pay the death penalty."

posed, and the cases are remanded for further proceedings."

Each of the Justices who joined in the Court's judgment expressed his views in a separate opinion. Justices Brennan and Marshall concluded that the imposition of the death penalty constituted cruel and unusual punishment in all cases and in all circumstances and therefore violated the Eighth and Fourteenth Amendments to the federal constitution. Justice Douglas concluded that statutes like those involved in *Furman* which permitted discretion in the imposition vel non of the death penalty were unconstitutional in their operation, as infrequently and arbitrarily applied to unpopular groups, thereby violating the principle of equal protection implicit in the Eighth Amendment's ban on cruel and unusual punishment. Justice Stewart, while declining to rule on the constitutionality of capital punishment in the abstract, concluded that statutes permitting discretion in the imposition of the dealth penalty were arbitrarily applied in a wanton and freakish manner and, consequently, violated the constitutional prohibition against cruel and unusual punishment. Justice White expressed views similar to those held by Justice Stewart; he believed that because of the infrequent and unjustified use of non-mandatory death penalties for murder and rape, discretionary imposition of the death penalty for those offenses constituted cruel and unusual punishment. The Chief Justice and Justices Blackmun, Powell, and Rehnquist dissented, each by separate opinion. In his dissent, in which each of the other dissenting Justices joined, Justice Powell observed:

> "Whatever uncertainties may hereafter surface, several of the consequences of today's decision are unmistakably clear. . . . The Court's judgment removes the death sentences previously imposed on some 600 persons awaiting punishment in state and federal prisons throughout the country. . . ." 408 U. S. at 416-17, 92 S. Ct. at 2817, 33 L.Ed.2d at 452.

In light of its decision in *Furman,* the Court summarily vacated death sentences imposed in 120 other cases then pending on its docket; it entered orders in the language of *Furman,* vacating the judgment in each of these cases "insofar as it leaves undisturbed the death penalty imposed" and remanded all the cases "for further proceedings." *Bartholomey* was one of the cases so remanded to us for further proceedings. *Bartholomey v. Maryland,* 408 U. S. 938, 92 S. Ct. 2870, 33 L.Ed.2d 759 (1972). In obedience to the Supreme Court's remand order, we heard argument on the question whether, in view of the particular facts and circumstances involved in Bartholomey's case, the imposition and carrying out of the death penalty would constitute cruel and unusual punishment in violation of the constitutional principles enunciated in *Furman.* The Public Defender, representing Bartholomey, maintained that it would; he argued that *Furman* "will not permit the death sentence under any statutory scheme which is discretionary with the trier of fact and, in fact, makes impermissible any discretionary sentencing statute which may be arbitrarily applied"; that the imposition of the death penalty in Bartholomey's case is unconstitutional under the Maryland statutory scheme because not mandatory; and that *Furman's* holding applied without regard to the nature of the offense or the particular circumstances under which the crime was committed. The Attorney General, representing the State of Maryland, argued that *Furman* did not flatly prohibit the death sentence as a permissible form of punishment even where the statute authorizing its imposition was not mandatory. Noting differences between the Maryland statute (§ 413), under which Bartholomey was sentenced to death, and the Georgia and Texas statutes involved in *Furman,* the Attorney General maintained that "each case, and the procedures of each state should be examined on a case-by-case basis to determine if, in fact, the death penalty as there imposed had been meted out in such a random and infrequent manner as to constitute in that case or in that class of cases a cruel and

unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States." Although acknowledging that the Maryland statutes vest discretion in both the jury and the judge in the imposition of the death penalty, the Attorney General suggested that under *Furman* it must be shown that such discretion was "arbitrarily, capriciously or discriminatorily applied before the Court can find that the death penalty constitutes a 'cruel and unusual' punishment in the constitutional sense."

We entertain not the slightest doubt that the imposition of the death sentence under any of the presently existing discretionary statutes of Maryland which authorize, but do not require, that penalty is unconstitutional under *Furman* as violative of the Eighth and Fourteenth Amendments to the federal constitution.[2] In other words, we think the net result of the holding in *Furman* is that the death penalty is unconstitutional when its imposition is not mandatory. See, *e.g., State v. Martineau,* 293 A. 2d 766 (1972) ; *State v. Leigh,* 31 Ohio St. 2d 97, 285 N.E.2d 333 (1972) ; *Commonwealth v. Bradley,* 449 Pa. 19, 295 A. 2d 842 (1972) ; *Adams v. State,* 284 N.E.2d 757 (1972) ; *State v. Dickerson,* 298 A. 2d 761 (1972) ; *Adderly v. Wainwright,* (M.D. Fla. 1972) ; *Johnson v. Warden,* 16 Md. App. 227, 295 A. 2d 820 (1972). That *Furman* invalidates *all* death penalties imposed pursuant to discretionary statutes is so, without regard to the nature of the offense, the particular circumstances under which the crime was committed, or the particular procedure followed in imposing the death sentence. Indeed, included among the 120 cases which the Supreme Court remanded for further proceedings in light of *Furman* were cases involving murders of law enforcement officers (as in *Bartholomey*), mass killings, and aggravated rapes.[3]

---

2. In addition to the death penalty authorized by § 413 for murder in the first degree, §§ 12, 337, 461, and 462 of Article 27 authorize the imposition of that penalty, respectively, for assault with intent to rape, kidnapping, rape and statutory rape.

3. *Murder of Law Enforcement Officers.* See, *e.g.,* (in addition

The invalidity of Bartholomey's death sentences does not, of course, affect the legality of either of his underlying murder convictions.[4] See *Moore v. Illinois*, 408 U. S. 786, 92 S. Ct. 2562, 33 L.Ed.2d 706 (1972) ; *Brady v. State*, 226 Md. 422, 174 A. 2d 167 (1961), *aff'd*, 373 U. S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963) ; *Bird v. State*, 231 Md. 432, 190 A. 2d 804 (1963) ; *State v. Martineau, supra*. The "further proceedings" required to be taken under *Furman* are limited to those involved in imposing valid sentences upon Bartholomey. The only lawful sentence that can be imposed for murder in the first degree under the controlling statute (§ 413) is life imprisonment; no discretion is lodged in the sentencing judge and the imposition of any other sentence would plainly be illegal. In so concluding, we are not unmindful of Article 27, § 643 which provides that "where the law prescribing a punishment for crime fixes a maximum and a minimum penalty therefor, . . . [the sentencing judge] may, in lieu of the minimum penalty so prescribed, impose a less penalty of the same character; provided, however, that nothing herein contained shall be con-

---

to *Bartholomey*) State v. Delgado, 161 Conn. 536, 290 A. 2d 338 (1971), remanded *sub nom.* Delgado v. Connecticut, 408 U. S. 940, 92 S. Ct. 2879, 33 L.Ed.2d 764 (1972); Commonwealth v. Stewart, 270 N.E.2d 811 (1971), remanded *sub nom. Stewart v. Massachusetts*, 408 U. S. 845, 92 S. Ct. 2845, 33 L.Ed.2d 744 (1972); State v. Atkinson, 253 S. C. 531, 172 S.E.2d 111 (1970), remanded *sub nom.* Atkinson v. South Carolina, 408 U. S. 936, 92 S. Ct. 2859, 33 L.Ed.2d 752 (1972).

*Mass Murder.* See, *e.g.*, Eyman v. Alford, 448 F. 2d 306 (9th Cir. 1969), remanded *sub nom.* Alford v. Eyman, 408 U. S. 939, 92 S. Ct. 2874, 33 L.Ed.2d 762 (1972); State v. Davis, 158 Conn. 341, 260 A. 2d 587 (1969), remanded *sub nom.* Davis v. Connecticut, 408 U. S. 935, 92 S. Ct. 2856, 33 L.Ed.2d 750 (1972); State v. Kelbach, 23 Utah 2d 231, 461 P. 2d 297 (1969), remanded *sub nom.* Kelbach v. Utah, 408 U. S. 935, 92 S. Ct. 2858, 33 L.Ed.2d 751 (1972).

*Aggravated Rape.* See State v. Chance, 279 N. C. 643, 185 S.E.2d 227 (1971), remanded *sub nom.* Chance v. North Carolina, 408 U. S. 940, 92 S. Ct. 2878, 33 L.Ed.2d 764 (1972); State v. Williams, 252 La. 1023, 215 So. 2d 799 (1968), remanded *sub nom.* Williams v. Louisiana, 408 U. S. 934, 92 S. Ct. 2851, 33 L.Ed.2d 747 (1972).

4. Nor does the invalidity of Bartholomey's death sentences affect in any way the other judgments of conviction and sentences pronounced upon him at his trial for assault with intent to murder and escape.

strued as affecting any maximum penalty fixed by law, or the punishment for any crime where the law provides one and only one penalty." But in view of *Furman,* life imprisonment is the only penalty permitted under § 413 and, consequently, the provisions of § 643 have no application to a sentence imposed under § 413. Moreover, and of equal importance, under Maryland law prior to *Furman* the sentencing judge could not impose a lesser sentence than that prescribed in § 413, such as a term of years. *Dodson v. State,* 14 Md. App. 483, 486, 287 A. 2d 324, 325 (1972) held, and we agree, "that the Legislature, in prescribing the penalty for first degree murder in 1916, did not intend to prescribe a maximum and a minimum (which would contemplate a range in between), but intended to prescribe two alternative penalties, each fixed by the Legislature itself, without committing to the trial judge any discretion except a choice between the two, with that choice available only when not precluded by the jury's verdict." See also *White v. State,* 227 Md. 615, 177 A. 2d 877 (1962), *rev'd on other grounds,* 373 U. S. 59, 83 S. Ct. 1050, 10 L.Ed.2d 193 (1963).

Since the sentences imposed upon Bartholomey have heretofore been vacated by the Supreme Court, and the sole jurisdiction to impose new sentences lies with the trial court, *Gill v. State,* 265 Md. 350, 289 A. 2d 575 (1972) ; *Cochran v. State,* 119 Md. 539, 87 A. 400 (1913) ; *McDonald v. State,* 45 Md. 90 (1876), we shall, pursuant to the provisions of Maryland Rule 871 b [5] remand the case to the lower court for resentencing with directions that it sentence Bartholomey to life imprisonment on each of his murder convictions. At the resentencing hearing, Bartholomey has the right to be present and represented by counsel, additionally, he should be afforded his right of allocution under Rule 761 a.[6] *Brown v. State,*

[5]. "If in an appeal in a criminal action this Court shall reverse the judgment for error in the judgment or in the sentence, this Court will remand the case to the lower court in order that such court may pronounce the proper judgment or sentence."

[6]. Maryland Rule 775 provides:

"The accused shall be present . . . at every stage of the trial

11 Md. App. 27, 272 A. 2d 659 (1971). Life imprisonment being the only permissible sentence that can be imposed upon Bartholomey, the sentencing judge need not consider any evidence at the sentencing hearing to assist him in automatically pronouncing that sentence. In imposing such sentence, and in determining the date from which it will commence to run, the sentencing judge must, for parole eligibility purposes under Article 41, § 122 (b), credit Bartholomey with all time spent in confinement following the imposition of the illegal death sentences. See Article 5, § 17; *Dennis v. Warden,* 12 Md. App. 512, 280 A. 2d 53 (1971).[7]

The Public Defender suggests that the sentencing court also consider, prior to resentencing, the mental competency of the accused to understand the nature or object of the sentencing hearing and to assist his counsel. That, of course, is always a consideration at a sentencing hearing, no more so on the remand in this case than in any other case. Equally clear is the fact that on remand the proper forum to resentence Bartholomey is the original sentencing court and not necessarily the original sentencing judge. See Maryland Rule 764; Article 27, § 642; Annot., 83 A.L.R.2d 1032 (1962) ; *Jordan v. State,* 5 Md. App. 520, 248 A. 2d 410 (1968) ; *Prather v. Warden,* 1 Md. App. 478, 231 A. 2d 726 (1967) ; *People v. Collins,* 25 Mich. App. 609, 181 N.W.2d 601 (1970) ; *People v. Gilbert,* 227 Mich. 538, 198 N. W. 971 (1924).

Finally, as pointed out by the Attorney General, under

---

. . . and at the imposition of sentence, except as provided in this Rule. . . . The defendant's presence is not required at a reduction of sentence under Rule 764 (Revisory Power of Court)...."

There being no valid sentence imposed upon Bartholomey, the imposition of life sentences upon him, although automatic, cannot be considered a reduction in his sentences. A sentencing hearing is a critical stage of the proceeding and Bartholomey is entitled to be present.

7. Article 41, § 122 (b) provides:

"No person who has been sentenced to life imprisonment shall be eligible for parole consideration until he shall have served in confinement fifteen years. . . ."

In *Dennis,* it was held that the fifteen-year parole eligibility period is to be measured from the date the life sentence was imposed (full credit being afforded for the period of confinement served under the illegal sentences).

Article 27, § 700 each prisoner in any of the penal institutions of the State is entitled to a diminution of his period of confinement for (1) his good behavior (five days off for each month) (§ 700 (b)) ; (2) hard work at industrial, agricultural or administrative tasks (an additional five days off for each month) (§ 700 (c)) ; and (3) academic progress (an additional five days off for each month) (§ 700 (d)). Bartholomey, as a prisoner sentenced to death, was not credited with any "good time" against a future release date since his release from confinement was never contemplated. Nor as a prisoner sentenced to death was he afforded an opportunity to engage in any institutional work or academic programs. The State maintains that Bartholomey would be entitled to credit for good behavior, if merited, but not to any credits for work or academic programs, since he engaged in none. Bartholomey, on the other hand, claims that because he was denied an opportunity to work or participate in academic programs, full credit must be entered against his life sentences in calculating his period of lawful confinement and his eligibility for parole. We think the matter of the time credits earned by Bartholomey under § 700 during his confinement under the illegal death sentences is peculiarly within the province of the appropriate officials in the Department of Public Safety and Correctional Services, to be determined by that agency under established policies and in accordance with the merits of each case.

Bartholomey's sentences having heretofore been vacated, we shall remand the case to the lower court for imposition of life sentences in accordance with the procedures herein outlined.[8]

---

8. In addition to *Bartholomey*, eight other Maryland cases in which the death penalty had been imposed for murder in the first degree were pending before the Supreme Court when *Furman* was decided. The court vacated the death sentences imposed in each case and remanded for further proceedings in light of *Furman*. Six of the cases were remanded to us. Cunningham v. Warden, 408 U. S. 938, 92 S. Ct. 2867, 33 L.Ed.2d 757 (1972); Gilmore v. Maryland, 408 U. S. 940, 92 S. Ct. 2876, 33 L.Ed.2d 763 (1972); Johnson v. Maryland, 408 U. S. 937, 92 S. Ct. 2866, 33 L.Ed.2d 757

## II

Dolphus Joyner was found guilty of murder in the first degree by a jury on September 21, 1971; he was thereafter sentenced by the court to death.[9] Because appeals from convictions in cases involving imposition of the death penalty are by Article 5, § 12 within the jurisdiction of this Court, Joyner's appeal was filed with us rather than the Court of Special Appeals. In his appeal, Joyner raised a number of contentions seeking reversal of his judgments. *Furman* was decided after Joyner's brief was filed in this Court. We heard argument in Joyner's case limited to the question of the effect of *Furman* upon Joyner's death sentence. For the reasons cited by us in *Bartholomey*, we vacate Joyner's death sentence and remand the case to the trial court for imposition of a life sentence in accordance with the procedures heretofore outlined in *Bartholomey*. Once the trial court has imposed a life sentence upon Joyner, it should forthwith transmit the case to the Court of Special Appeals so that that court may promptly determine the merits of the questions raised by Joyner in his appeal. In view of the delay in passing upon the merits of Joyner's case, the Court of Special Appeals should look favorably upon a motion to advance, if one is filed.

## III

Theodore Roosevelt Arrington was convicted of murder in the first degree at a court trial on March 30, 1961.

---

(1972); Miller v. Maryland, 408 U. S. 934, 92 S. Ct. 2851, 33 L.Ed.2d 747 (1972); Strong v. Maryland, 408 U. S. 939, 92 S. Ct. 2872, 33 L.Ed.2d 760 (1972); Tull v. Warden, 408 U. S. 939, 92 S. Ct. 2871, 33 L.Ed.2d 760 (1972). We are today entering orders in each of these cases remanding to the lower court for imposition of a life sentence in accordance with the views expressed and procedures outlined in *Bartholomey*. Two cases, Arrington v. Maryland, 408 U. S. 938, 92 S. Ct. 2869, 33 L.Ed.2d 759 (1972) and Mefford v. Warden, 408 U. S. 935, 92 S. Ct. 2856, 33 L.Ed.2d 750 (1972) were remanded to the United States Court of Appeals for the Fourth Circuit and are not under our jurisdiction. (See *infra*, III)

9. He was also found guilty of two counts of armed robbery, one count of assault with intent to murder, and one count of carrying a dangerous weapon openly.

He was sentenced to death on July 21, 1961. On appeal, we affirmed. *Arrington v. State*, 228 Md. 143, 179 A. 2d 344 (1962). A petition for a writ of habeas corpus filed by Arrington in the United States District Court for the District of Maryland was denied on April 17, 1970. An appeal from that denial taken to the United States Court of Appeals for the Fourth Circuit was dismissed on April 16, 1971 after which Arrington filed a petition for a writ of certiorari in the Supreme Court of the United States. That petition was granted in the wake of *Furman,* the Supreme Court ordering that the judgment against Arrington be vacated "insofar as it leaves undisturbed the death penalty imposed. . . ." *Arrington v. Maryland, supra* note 8. The Supreme Court remanded the case to the Fourth Circuit on July 31, 1972 which, in turn, remanded it to the U. S. District Court.

On October 3, 1972, Arrington filed a "Petition to Vacate Illegal Sentence" in this Court. In light of *Furman* he prayed that we issue an order vacating his death sentence and remand the case to the sentencing court for a new trial on the issue of sentencing. As Arrington's death sentence has already been vacated, and as we are without original jurisdiction to act on his petition, (see Article 26, § 30, and *State v. Rutherford,* 145 Md. 363, 125 A. 725 (1922)) we must dismiss his appeal. It is, of course, likely that the U. S. District Court will remand the case to the State trial court in which Arrington was convicted, with a directive to impose a lawful sentence upon him or release him. Arrington may, if he wishes, file a petition directly in the trial court in which he was sentenced seeking the correction of his illegal sentence under Rule 764 a.[10] In any event, the procedure ultimately to be followed in resentencing Arrington in the lower court will be as outlined by us in *Bartholomey.*

10. Rule 764 a provides:
"The court may correct an illegal sentence at any time."
That the "court" referred to in the Rule is the trial court, and not the appellate court, is clear. See Rule 5 i.

## IV

Elisha Sterling, Jr. was found guilty by a jury of rape on November 22, 1966. The jury did not add to its verdict the words "without capital punishment," as it was authorized to do under Article 27, § 463 had it wanted to prohibit the sentencing judge from imposing the death penalty and limit the sentence to a term not in excess of twenty years; the court sentenced Sterling to death on December 2, 1966 under the provisions of Article 27, § 461.[11] On appeal, we affirmed. *Sterling v. State*, 248 Md. 240, 235 A. 2d 711 (1967). Sterling's petition for a writ of habeas corpus filed in the U. S. District Court was dismissed on March 21, 1972 and no appeal was taken. At the time *Furman* was decided, Sterling had no proceedings pending in any court. He thereafter filed a "Petition to Vacate Illegal Sentence" in this Court, praying that in conformance with *Furman* we pass an order vacating the sentence of death imposed upon him and remand the case to the trial court for a new trial on the issue of sentencing.

For the reasons set forth in *Arrington* (*supra,* III), we have no original jurisdiction to consider the merits of Sterling's petition. That his death sentence is illegal under *Furman* is, however, entirely clear. That the trial court which imposed the sentence has the power to vacate it under Rule 764 a (*supra,* note 10), and thereafter

---

11. § 461 provides:

"Every person convicted of a crime of rape or as being accessory thereto before the fact shall, at the discretion of the court, suffer death, or be sentenced to confinement in the penitentiary for the period of his natural life, or undergo a confinement in the penitentiary for not less than eighteen months nor more than twenty-one years; and penetration shall be evidence of rape, without proof of emission."

§ 463 provides:

"The jury which finds any person guilty of rape under § 461 of this subtitle, or guilty of carnal knowledge under § 462 of this subtitle, may add to their verdict the words 'without capital punishment,' in which event the sentence of the court shall not exceed twenty years in the penitentiary; and in no such case in which the jury has returned a verdict including the words 'without capital punishment' shall the court in imposing sentence, sentence the convicted person to pay the death penalty or to be confined in the penitentiary for more than twenty years."

impose a lawful sentence, is likewise clear. Sterling could obtain the same result by filing a petition under the provisions of the Uniform Post Conviction Procedure Act, Article 27, § 645A; that statute provides in subsection (a) that a person convicted of a crime and incarcerated under a sentence imposed in violation of the federal or State constitutions may have such illegal sentence set aside or corrected.

Unlike the automatic life sentence which must be imposed under § 413 upon persons convicted of murder in the first degree, persons convicted of rape may be sentenced under § 461 to life imprisonment, or to a lesser sentence of from eighteen months to twenty-one years in the penitentiary. Questions therefore arise with respect to imposing a lawful sentence upon Sterling which are not presented in resentencing persons convicted of murder in the first degree. Both the Attorney General and the Public Defender have urged, notwithstanding our lack of original jurisdiction to act on Sterling's petition, that we address ourselves to these questions and express our views. We shall do so because of the exceptional nature and importance of the issues involved and because, in addition to Sterling, four other prisoners convicted of rape and sentenced to death [12] must properly be resentenced. See *Kardy v. Shook*, 237 Md. 524, 207 A. 2d 83 (1965).

There is, of course, nothing illegal in the jury's verdict pronouncing Sterling guilty of rape; that verdict stands and, as in *Bartholomey*, further action need be taken only on the sentence, and not on the merits of Sterling's conviction. That the jury did not add the limiting words to its verdict ("without capital punishment") permitted the sentencing judge full discretion in the matter of sentencing Sterling to any of the pen-

_____

12. We affirmed the judgments of conviction and imposition of the death sentences in these cases. Jones v. State, 247 Md. 530, 233 A. 2d 791 (1967); Domneys v. State, 229 Md. 388, 182 A. 2d 880 (1962); Shorey v. State, 227 Md. 385, 177 A. 2d 245 (1962); Ralph v. State, 226 Md. 480, 174 A. 2d 163 (1961) (but see Ralph v. Warden, 438 F. 2d 786 (4th Cir. 1970), *cert. denied*, 408 U. S. 942, 92 S. Ct. 2869, 33 L.Ed.2d 766 (1972)).

alties authorized by § 461. That the death sentence imposed by the sentencing judge upon Sterling has now been outlawed by *Furman,* and must therefore be vacated, does not automatically mandate imposition of the next most severe penalty which the court could lawfully impose, *i.e.,* life imprisonment. On the contrary, in resentencing Sterling, and the four other prisoners similarly situated, the sentencing court must approach its task as if no sentence had ever been imposed, and it was exercising its sentencing discretion under § 461 for the first time. Considering the case in this posture, the sentencing judge may inquire into the past criminal record of the defendant and hear evidence and receive reports in aggravation or mitigation of punishment; the inquiry of the judge is not limited by the strict rules of evidence and he is invested with wide discretion in determining the sentence to be imposed within the authorized statutory limits. *Purnell v. State,* 241 Md. 582, 217 A. 2d 298 (1966) ; *Farrell v. State,* 213 Md. 348, 131 A. 2d 863 (1957). In other words, to aid the sentencing judge in fairly and intelligently exercising the discretion vested in him, the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a judge ought to have before him in determining the sentence that should be imposed.[13] *Skinker v. State,* 239 Md. 234, 210 A. 2d 716 (1965) ; *Scott v. State,* 238 Md. 265, 208 A. 2d 575 (1965) ; *Costello v. State,* 237 Md. 464, 206 A. 2d 812 (1965) ; *Driver v. State, supra* note 13; *Baker v. State, supra* note 13. The sentencing judge may, but need not, obtain a pre-

---

13. Any information which might influence the judgment of the sentencing judge, not received from the defendant himself, or given in his presence, should (without necessarily disclosing its source) be called to the defendant's attention so as to afford him an opportunity to refute or discredit it. Driver v. State, 201 Md. 25, 92 A. 2d 570 (1952); Turner v. State, 5 Md. App. 584, 248 A. 2d 801 (1968); Jordan v. State, 5 Md. App. 520, 248 A. 2d 410 (1968); Baker v. State, 3 Md. App. 251, 238 A. 2d 561 (1968).

sentence report under Article 41, § 124 (b).[14] Of course, the sentencing judge may take into consideration the defendant's conduct after the offense was committed, *viz.*, he may consider evidence of events occurring after the date of the original sentencing to whatever extent he may deem necessary. *North Carolina v. Pearce*, 395 U. S. 711, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969) ; *Williams v. New York*, 337 U. S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949) ; *Purnell v. State, supra; Gatewood v. State,* 15 Md. App. 450, 291 A. 2d 688 (1972).[15]

No positive requirement exists, as seemingly suggested by the Public Defender on behalf of Sterling, that the resentencing judge must hear the testimony of witnesses concerning the particulars of the crime in order to capture the "flavor" of the case and the circumstances under which the offense was committed. Neither is the resentencing judge's responsibility necessarily limited, as suggested by the Attorney General, to a simple review of the transcript of the trial. As indicated, Sterling is entitled to a meaningful sentencing hearing at which full consideration must be given to the full range of punishment alternatives prescribed by § 461. It goes without saying that, as in *Bartholomey,* Sterling is entitled to be present at the sentencing hearing, represented by counsel, and afforded his right of allocution.

The fact that Sterling elected to be tried by a jury which had the power under § 463 to qualify its verdict

14. "(b) The parole agents of the Department shall provide the judges of said courts with presentence reports or other investigations in all cases when requested by any judge. The presentence reports shall be made available, upon request, to the defendant's attorney and the State's Attorney's Office. However presentence reports shall be confidential and not available for public inspection except upon court order or for use by any correctional institution. Such agents shall also perform such other probationary services as the said judges may from time to time request."

15. In *Pearce,* the court said that "[t]he freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York,* ... [337 U. S. at 247, 69 S. Ct. at 1083, 93 L. Ed. at 1342] that a State may adopt the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.'" 395 U. S. at 723, 89 S. Ct. at 2079, 23 L.Ed.2d at 668.

so as to limit the extent of punishment to a term not in excess of twenty years imprisonment does not require that he be afforded another jury determination on the issue of punishment prior to the court's imposition of a new sentence upon him. We think the jury's refusal to add the limiting words "without capital punishment" to its verdict was lawful when done, and nothing in *Furman* mandating the invalidity of death sentences imposed under discretionary statutes inhibits resentencing by the court in such circumstances without again affording a jury the opportunity it once rejected to limit the length of punishment. See *Johnson v. Warden,* 16 Md. App. 227, 295 A. 2d 820 (1972).[16]

Nor do we think that those individuals charged with rape who initially waived a jury trial and elected to be tried by the court, and upon whom the court, after conviction, imposed the death sentence (see *Jones* and *Ralph, supra* note 12), have the right, *at the resentencing hearing,* to challenge the legality of their jury trial waivers. Their object, of course, is to obtain a new trial on the issue of punishment by a jury empowered to add the words "without capital punishment" to the verdict of guilt, and thus limit the resentencing court to a sentence not in excess of twenty years. But the question whether there was a valid waiver of the constitutional right to a jury trial is one properly to be raised and decided under the provisions of the Post Conviction Procedure Act and not at the resentencing hearing. See *State v. Zimmerman,* 261 Md. 11, 273 A. 2d 156 (1971). See also Maryland Rule 741. If it be established at a post conviction hearing that no valid jury trial waiver was made, the new trial afforded before a jury would not, of course, be limited to the issue of punishment.

If, upon resentencing, Sterling is given a life sentence, full credit must be given for parole eligibility purposes, as in *Bartholomey,* for all time spent in confinement under the illegal death sentences. If the maximum term of

---

16. In addition to Sterling, Shorey and Domneys were also tried by jury. See *supra* note 12.

twenty-one years is imposed, the sentencing judge must credit against such sentence all time spent in confinement under the illegal death sentence, as well as all time spent in jail prior to trial and initial sentencing. *Wright v. Warden,* 11 Md. App. 673, 276 A. 2d 411 (1971), *Jones v. State,* 11 Md. App. 468, 275 A. 2d 508 (1971). If less than the maximum term of years is imposed, the new sentence must clearly reflect that full credit was given for all time spent in confinement under the illegal death sentence, but time spent in jail prior to trial and initial sentence may, but need not, be credited against the new sentence. *Dennis v. Warden, supra.*[17]

No. 106: *Case remanded to the trial court for imposition of life sentences in accordance with the views expressed and procedures outlined in this opinion.*[18]

No. 386: *Sentence of death vacated; case remanded to the trial court for imposition of a life sentence in accordance with the views expressed and procedures outlined in this opinion.*[19]

No. 2: *Appeal dismissed for want of jurisdiction.*

No. 3: *Appeal dismissed for want of jurisdiction.*

17. These sentencing principles will, of course, also apply to the resentencing of Shorey, Domneys, Jones, and Ralph.

18. Other cases not heretofore cited in this opinion involving Maryland prisoners convicted of first degree murder and sentenced to death are Brice v. State, 264 Md. 352, 286 A. 2d 132 (1972); Wilson v. State, 261 Md. 551, 276 A. 2d 214 (1971); Veney v. State, 251 Md. 182, 246 A. 2d 568 (1968); DeToro v. State, 227 Md. 551, 177 A. 2d 847 (1962); Brown v. State, 225 Md. 349, 170 A. 2d 300 (1961); Boblit v. State, 220 Md. 454, 154 A. 2d 434 (1959). We have no original jurisdiction to vacate the death sentence, and remand for resentencing, in any of these cases. Each of these individuals, however, is clearly entitled to have his death sentence vacated under *Furman* and a life sentence imposed pursuant to the procedures heretofore set forth.

19. Robert R. Robertson was found guilty of murder in the first

*Barnes, J., dissenting:*

I dissent because, after a careful review of the five opinions of the plurality justices in *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), I cannot find any *holding* by the Supreme Court of the United States which requires us to hold or to indicate that the Maryland statutes in regard to capital punishment are unconstitutional under any provisions of the Federal Constitution or which requires us to change, in any way, the death penalties imposed in *Bartholomey v. State* and in the companion cases referred to in the majority opinion.

I will begin with some general observations in regard to the duty of judges of the highest appellate court of a State to support and effectuate the provisions of the Constitution of the United States, on the one hand, and the Constitution and Laws of the State, on the other. Judges of this State take an oath upon their qualification as judges to support *both* Constitutions and this dual obligation to the dual sovereigns frequently poses a difficult dilemma. There is, of course, no doubt that where the Constitution and Laws of Maryland conflict with a provision of the Constitution of the United States, the provision of the latter controls a decision of this Court as the supreme law of the land, not only by virtue of the

degree and sentenced to death on January 4, 1972. His appeal from that judgment and sentence was pending before us when *Furman* was decided. We are today entering an order vacating the death sentence imposed upon him and remanding the case to the trial court for imposition of a life sentence in accordance with the procedures outlined in *Bartholomey.* As in *Joyner, supra* II, after the trial court has imposed a life sentence upon Robertson, the case should be transmitted to the Court of Special Appeals so that the merits of Robertson's appeal can be adjudicated by that court.

Melvin Steward was found guilty of murder in the first degree and sentenced to death. On appeal, we affirmed in an unreported opinion. Steward v. State, No. 44, September Term, 1971 (filed June 29, 1972). In view of *Furman,* we stayed our mandate by order dated July 31, 1972. Since we have retained jurisdiction in Steward's case, we are today entering an order vacating Steward's death sentence and remanding the case to the trial court for imposition of a life sentence in accordance with the procedures set forth in *Bartholomey.*

Supremacy Clause in the Federal Constitution (Article VI) but also because Article 2 of the Declaration of Rights in the Maryland Constitution provides:

"The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which shall be made, under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding."

The critical question in cases involving an alleged conflict between the provisions of the Federal Constitution and the Constitution and Laws of this State is what has the Supreme Court of the United States *held* in that regard. For a *holding* by that Court, five justices must agree upon the proposition advanced as a holding and, until this occurs, this Court is under no obligation to follow indications or suggestions of a plurality of the Supreme Court or of any combination of the opinions of justices less than the required five. On the contrary, we are obligated to support and effectuate the Constitution and Laws of this State until there is a *holding* of the Supreme Court indicating an unconstitutional conflict with provisions of the Federal Constitution as interpreted by a five-justice majority of the Supreme Court. Prior to approximately forty years ago, the determination by State Courts of last resort of the holdings of the Supreme Court was not a difficult task. With the proliferation of opinions by individual justices, particularly in the last decade, it has become increasingly difficult if not impossible to interpret many cases. In my opinion, this Court is not required *to guess* at what five justices should or might have done in a particular case. The obligation to reach a binding *holding* is upon the Supreme Court and not upon the State Courts who surely are not required to anticipate or speculate upon what five justices

of the Supreme Court might or should agree upon in some other related factual situation. This would not only be futile, but would not exhibit a proper deference to the Supreme Court's own theoretical ability to reach its own decisions.

I have considered the dilemma of a judge of this Court in this situation in my concurring opinion in *Montgomery County Council v. Garrott*, 243 Md. 634, 651-52, 222 A. 2d 164, 173 (1966), in which I stated:

"The dilemma presented to a judge of the highest appellate court of a State arises from his oath to support and defend *both* the Constitution of the United States and the Constitution of his State. In view of the supremacy clause of the Constitution of the United States, it is clear that when the *provisions of that document* conflict with the provisions of the Constitution of a State, the former must control and further that the interpretation of the meaning of the provisions of the Constitution of the United States by the Supreme Court must be given effect by the judges of the State courts upon the principle of *stare decisis*—a principle of the essence of the judicial process. When, however, the Supreme Court itself in the first case construing a provision of the United States Constitution and in a number of decisions applying the principle established by that first case, has held that a provision of the United States Constitution does not apply to the States or does not present a justiciable issue because political in nature, and with a due regard for the provisions of the Ninth and Tenth Amendments, does the doctrine of *stare decisis* properly apply to decisions of the Supreme Court in which a bare majority of that Court, itself, declines to follow the doctrine of *stare decisis*? I have reluctantly reached the conclusion that we are not free to refuse to apply the doctrine of *stare decisis* even though

the Supreme Court has departed from that doctrine. The remedy lies with the people and their representatives in Congress and not with us. This conclusion is a heavy burden and painful yoke which must be borne, but it need not be borne willingly and with silent submission. Indeed, as I have already indicated in my concurring opinion in the recent case of *Truitt v. Board of Public Works*, 243 Md. 375, 411, 221 A. 2d 370, 392 (1966), I believe it to be the *duty* of appellate judges of the several States to point out, in all cases where relevant, their opinion of the errors of the Supreme Court and the unfortunate effects of these errors. In no case should these errors be extended by the State courts."

In this setting, I now turn to the five opinions of Douglas, Brennan, Stewart, White and Marshall, JJ., in *Furman*. There were three cases presented for decision, *i.e., Furman v. Georgia,* involving a conviction and death sentence under the Georgia law; *Jackson v. Georgia,* involving a conviction for rape and the death sentence also under the Georgia law; and, *Branch v. Texas,* involving a conviction for rape and a death sentence under the law of Texas. Certiorari was granted, as pointed out by the per curiam statement before the opinions, limited to the following question:

" 'Does the imposition and carrying out of the death penalty in [these cases] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?' " 408 U. S. 239, 92 S. Ct. 2727, 33 L.Ed.2d 350.

It will be further observed in the per curiam statement that the following appears:

"The Court *holds* that the imposition and carrying out of the death penalty *in these cases* constitutes cruel and unusual punishment in viola-

tion of the Eighth and Fourteenth Amendments. The judgment *in each case* is therefore reversed insofar as it leaves undisturbed the death sentence imposed, and *the cases* are remanded for further proceedings."
(Emphasis supplied.)
408 U. S. 239-40, 92 S. Ct. 2727, 33 L.Ed.2d 350.

The one clear thing in these cases is that the "holding" of the five justices concurring in the per curiam statement was that the imposition and carrying out of the death penalty was unconstitutional in the three cases, *Furman, Jackson* and *Branch,* involving only the laws of Georgia and Texas. The Maryland law in regard to the death penalty—unlike that of any other State as will be considered more fully later in this dissenting opinion—*was not involved* or considered. The State of Maryland was not heard in regard to the validity or constitutionality of the Maryland law and the Supreme Court did not purport to pass upon its constitutional validity. Indeed, to attempt to make such a "holding" without briefs or argument on so vital and important a question would itself appear to be a denial of due process of law to the State, in the procedural sense, prohibited by the Fifth Amendment. However this may be, it is clear that in *Furman (Jackson* and *Branch),* the Supreme Court made no attempt to pass upon or invalidate the Maryland law in regard to capital punishment.

I will use *Bartholomey v. State* for the purposes of further analysis of the matters involved.

In *Bartholomey,* the Supreme Court, on June 29, 1972, passed the order referred to in the majority opinion, which *vacated* the judgment of this Court "insofar as it leaves undisturbed the death penalty imposed" and *remanded* the *Bartholomey* case to this Court *"for further proceedings."* Added to this was the statement "see *Stewart v. Massachusetts,* 408 U. S. 845 (1972)." When one turns to *Stewart v. Massachusetts,* the order was:

"Per Curiam. The appellant in this case was sen-

tenced to death. The imposition and carrying out of that death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972). The motion for leave to proceed *in forma pauperis* is granted. The judgment is therefore vacated insofar as it leaves undisturbed the death penalty imposed, and the case is remanded for further proceedings."

There is no suggestion that *Bartholomey* is controlled by *Stewart.* The designation is *"see"* Stewart. Our judgment in *Bartholomey* is not *reversed,* but was *vacated* insofar as the death sentence was concerned and remanded to us for further proceedings. I interpret this to mean that we are to reconsider the death penalty in *Bartholomey* with due consideration for the five opinions concurring in the per curiam statement in *Furman.* If this Court were not to consider the death penalty involved in the judgment in *Bartholomey,* that judgment would have been *"reversed,"* not *"vacated."* A consideration of the opinions of the five concurring justices confirms this interpretation.

Only *two* of the five concurring opinions—those of Brennan and Marshall, JJ.—indicate that the death penalty, *vel non,* is unconstitutional as violative of the Eighth and Fourteenth Amendments. *Three* of the concurring opinions indicate that the imposition of the death penalty *may* be constitutional in certain circumstances. It follows from this division of opinion that *each case* must be evaluated to ascertain whether or not the imposition of capital punishment *in that case* was cruel and unusual punishment.

The opinion of Mr. Justice Douglas indicates to me that he does not condemn statutes providing for capital punishment, as such, but does condemn the discriminatory application of such statutes to blacks, the poor, the disadvantaged and other minority groups. Indeed, his opinion appears to be predicated upon the "privileges

and immunities" clause or the "due process" clause rather than upon the "cruel and unusual punishment" clause of the Eighth Amendment. He stated:

"Whether the Privileges and Immunities route is followed, or the due process route, the result is the same."
408 U. S. at 241, 92 S. Ct. at 2728, 33 L.Ed.2d at 351.

Speaking of the "discretionary statutes"—presumably those of Georgia and Texas involved in the *Furman, Jackson* and *Branch* cases—he stated:

"Thus, these discretionary statutes are *unconstitutional in their operation. They are pregnant with discrimination* and *discrimination is an ingredient not compatible with the idea of equal protection of the laws* that is implicit in the ban on 'cruel and unusual' punishments."
(Emphasis supplied.)
408 U. S. at 256-57, 92 S. Ct. at 2735, 33 L.Ed.2d at 359.

It is significant also that Mr. Justice Douglas reviewed the facts in each of the three cases before the Supreme Court, pointing out that Furman, Jackson and Branch were all blacks. He indicated further that the rape cases in which Jackson and Branch were involved were not particularly aggravated by physical violence and grave bodily harm to the victims and that at the time Furman murdered a householder by shooting through a closed door he was suffering from grave mental deficiency. Furman was diagnosed by the staff of the Georgia Central State Hospital as "not capable of cooperating with his counsel in the preparation of his defense."

The *Bartholomey* case, however, is quite different. Bartholomey is white. He was convicted of the premeditated murder of the sheriff and deputy sheriff of Wicomico County in the course of an escape from the Wicomico County Jail in Salisbury where he was law-

fully detained. A loaded handgun had been smuggled into the jail by a friend of Bartholomey and he shot the two law enforcement officers in cold blood in his successful escape. Bartholomey also attempted to murder Ralph L. Pusey, who was present at the jail. His case was removed for trial from Wicomico County to Charles County and was presided over by then Chief Judge Digges, now an Associate Judge of this Court. All of Bartholomey's constitutional safeguards were afforded him. He was represented by able counsel who forcefully and competently defended him in the lower court and ably briefed and argued the case before us. Bartholomey was found to be sane by the jury under proper instructions and with adequate evidence to support its findings. There is no suggestion—and there can be none—that there was any discrimination against Bartholomey of any kind in the trial of his case and in the imposition of the death penalty. Indeed, the record indicated that Judge Digges, who imposed the death sentence, is personally of the opinion that it would be in the public interest if the General Assembly abolished the death penalty generally and most reluctantly believed it to be his duty, nevertheless, to impose the death penalty in Bartholomey's case.

There was nothing in the records in *Bartholomey* and the companion cases which even suggests that there has been any discrimination in Maryland in the imposition of the death penalty of the type mentioned by Mr. Justice Douglas in *Furman*.[1] Indeed one of the last persons on whom a death sentence was actually executed was George Edward Grammer, a white man, found guilty of murder in the first degree of his wife by the Criminal Court of Baltimore, sitting without a jury. See *Grammer v. State*, 203 Md. 200, 100 A. 2d 257 (1953), *cert. denied*, 347 U. S. 938, 74 S. Ct. 634, 98 L. Ed. 1088 (1954). In short, the Maryland statutes in regard to capital punishment are not "pregnant with discrimination" and there

---

1. This is in accord with my own observations during the 41 years I have been a member of the Maryland Bar, as a practitioner, a trial judge in Baltimore City and now as a judge of the Court of Appeals.

has been no discrimination in the operation of those statutes.

It may be added that even in jurisdictions in which the Legislature has abolished the death penalty for practically all crimes, this penalty is continued for persons who murder law enforcement officers or who murder while confined in jails or penitentiaries. *See* New York Penal Code § 125.30 (1972 Cum. Supp.) ; North Dakota Century Code § 12-27-13 (1960) ; 3 General Laws of Rhode Island § 11-23-2 (1970) ; Vermont Stat. Ann. Tit. 13, § 2303 (b) (1972 Cum. Supp.).

Inasmuch as there is no discrimination of any kind either alleged or proved in Bartholomey's case, as has already been stated, I can only conclude that the opinion of Mr. Justice Douglas indicates that his constitutional rights have not been denied. We should, then, adhere to our decision in that case—*see Bartholomey v. State,* 260 Md. 504, 273 A. 2d 164 (1971)—and reaffirm our holding sustaining the imposition of the death penalty in that case.

One opinion of the five concurring justices does not require the action of the majority of this Court. Where then is there a holding of five justices of the Supreme Court?

I now turn to the concurring opinions of Stewart and White, JJ. I will consider the opinion of Mr. Justice White first because Mr. Justice Stewart appears to rest his opinion in part upon the concept of discrimination in application of the death penalty statutes of Georgia and Texas developed in the opinion of Mr. Justice Douglas and in part upon the infrequency and capriciousness of imposition of the death penalty in those two States set forth in the opinion of Mr. Justice White.

Like Mr. Justice Douglas, the concurring opinion of Mr. Justice White is grounded upon the Georgia and Texas death penalty statutes and the practices of those two States in the imposition of the death penalty under those statutes. This is clear from the first paragraph of the opinion of Mr. Justice White, which states:

"The facial constitutionality of statutes requiring the imposition of the death penalty for the first degree murder, for more narrowly defined categories of murder or for rape would present quite different issues under the Eighth Amendment than are posed by the cases before us. In joining the Court's judgment, therefore, I do not at all intimate that the death penalty is unconstitutional *per se* or that there is no system of capital punishment that would comport with the Eighth Amendment. That question, ably argued by several of my Brethren, is not presented by these cases and need not be decided." 408 U. S. at 310-11, 92 S. Ct. at 2763, 33 L.Ed.2d at 390.

After observing that when the imposition of the death penalty ceases to realistically further the social ends it was deemed to serve, its imposition would violate the Eighth Amendment, he states:

"It is also my judgment that this point has been reached with respect to capital punishment as it is presently administered under the *statutes involved in these cases*. Concededly, it is difficult to prove as a general proposition that capital punishment, however administered, more effectively serves the ends of the criminal law than does imprisonment. But however that may be, I cannot avoid the conclusion that as the statutes *before us are now administered*, the penalty *is so infrequently imposed* that the *threat of execution is too attenuated to be of substantial service to criminal justice.*" (Emphasis supplied.) 408 U. S. at 312-313, 92 S. Ct. at 2764, 33 L.Ed.2d at 392.

Mr. Justice White concludes that:

"The short of it is that the policy of *vesting sentencing authority primarily in juries*—a decision

largely motivated by the desire to mitigate the harshness of the law and to bring community judgment to bear on the sentence as well as guilt or innocence—has *so effectively achieved its aims that capital punishment within the confines of the statutes now before us has for all practical purposes run its course."* (Emphasis supplied.)
408 U. S. at 313, 92 S. Ct. at 2764, 33 L.Ed.2d at 392.

As will be indicated later, neither the Maryland statutes in regard to the death penalty nor the imposition of death sentences under them come within the purview of the observations in Mr. Justice White's opinion.

The concurring opinion of Mr. Justice Stewart is also grounded upon the Georgia and Texas statutes and the three cases before the Supreme Court. He states:

"The constitutionality of capital punishment in the abstract is not, however, before us in these cases. For the Georgia and Texas legislatures have not provided that the death penalty shall be imposed upon all those who are found guilty of forcible rape. And the Georgia Legislature has not ordained that death shall be the automatic punishment for murder. In a word, neither State has made a legislative determination that forcible rape and murder can be deterred only by imposing the penalty of death upon all who perpetrate those offenses. As Mr. Justice White so tellingly puts it, the 'legislative will is not frustrated if the penalty is never imposed.' "
408 U. S. at 308-309, 92 S. Ct. at 2761-62, 33 L.Ed.2d at 389.

It is somewhat refreshing that Mr. Justice Stewart, on the subject of deterrence of some serious crimes by providing for imposition and execution of the death penalty, admits:

". . . I would say only that I cannot agree

that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law."
408 U. S. at 308, 92 S. Ct. at 2761, 33 L.Ed.2d at 389.

He approaches the discrimination concept of Mr. Justice Douglas when he concludes:

"These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. See *McLaughlin v. Florida,* 379 U. S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222. But racial discrimination has not been proved, and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."
408 U. S. at 309-10, 92 S. Ct. at 2762-63, 33 L.Ed.2d at 390.

Several relevant considerations emerge from the concurring opinions of White and Stewart, JJ. One is that their opinions are specifically confined to a consideration of the Georgia and Texas statutes and cases and do not have application to other different State statutes and practices. Secondly, they indicate that if in a particular jurisdiction the imposition of the death penalty is so infrequent as to have no meaningful impact as a deterrent or otherwise further the State policy underlying the imposition of the death penalty, then the imposition of the death penalty will be "cruel and unusual punishment" under the Eighth Amendment. Thirdly, they indicate that if the imposition of the death penalty by juries is wantonly and freakishly imposed under State statutes then such imposition will be considered to be cruel and unusual punishment prohibited by the Eighth Amendment.

Not only were the Maryland statutes in regard to capital punishment and the Maryland practice under those statutes not considered by White and Stewart, JJ., but, as later pointed out, the grounds on which they concurred in regard to the Georgia and Texas practices under the statutes of those States are not applicable in Maryland.

By this distillation, one finally sees that the opinions of only two concurring justices—Brennan and Marshall, JJ.—can be thought possibly to require the action of the majority in this case. The "tail wags the dog" here beyond peradventure.

It was argued before us that the opinions of White and Stewart, JJ., basically rest upon the proposition that all statutes providing for capital punishment must make such punishment mandatory in all crimes for which such a penalty is provided and no discretion of any kind can be exercised by judge or jury in any capital case. First of all, their opinions do not state such an extraordinary proposition and they do not purport to overrule the Supreme Court's decision in *McGautha v. California,* 402 U. S. 183, 91 S. Ct. 1454, 28 L.Ed.2d 711, decided on May

3, 1971, which held that the discretion reposed in juries in imposing the death sentence under California and Ohio statutes did not violate any provision of the Federal Constitution. In view of the fact that both White and Stewart, JJ., were part of the majority in *McGautha*, the majority opinion being written by Mr. Justice Harlan, I cannot believe that they intended to depart from the holding in *McGautha* decided only approximately 14 months prior to the decision in *Furman*. Mr. Justice Stewart does mention *McGautha* in Note 12 in his opinion but does not purport to question its holding.

Nor am I willing to believe that either Mr. Justice White or Mr. Justice Stewart would espouse such a harsh and long-abandoned viewpoint in regard to capital punishment. As Mr. Justice Douglas pointed out in his concurring opinion in *Furman*, the Supreme Court in *McGautha* "noted that in this country there was almost from the beginning a 'rebellion against the common-law rule imposing a mandatory death sentence on all convicted murderers.' " 408 U. S. at 245-46, 92 S. Ct. at 2730, 33 L.Ed.2d at 353. Mr. Justice Douglas also observed that the indiscriminate use of capital punishment by Lord Chief Justice Jeffreys during the Bloody Assizes during the last years of the reign of Charles II and the first years of the rule of James II earned Chief Justice Jeffreys well-earned universal opprobrium.[2] 408 U. S. at 254-55, 92 S. Ct. at 2734, 33 L.Ed.2d at 358. I am quite confident that neither Mr. Justice White nor Mr. Justice Stewart are advocating a return to the "Jeffreys Doctrine" in this country at this time.

As already indicated, Mr. Justice Brennan and Mr.

---

2. An interesting account of this episode and the extraordinary conduct of Chief Justice Jeffreys appears in Lord Campbell's *Lives of the Lord Chancellors* (1868), Vol. IV, pages 322-387, Chief Justice Jeffreys having been made Lord Chancellor by James II as a reward for his "many eminent and faithful services." In his *Lives of the Chief Justices* (1874), Vol. II, pages 332-337, Lord Campbell refers to Jeffreys as a "monster" and quotes King Charles II as shuddering at his approach with the remark: "That man has no learning, no sense, no manners, and more impudence than ten carted streetwalkers."

Justice Marshall were of the opinion that the imposition of the death penalty for any crime is unconstitutional as a "cruel and unusual punishment" forbidden by the Eighth and Fourteenth Amendments. Their reasoning is curious to say the least. Mr. Justice Brennan rested his conclusion on his thought that not only did the death penalty not "comport with human dignity," but it has been inflicted arbitrarily, was unacceptable to contemporary society and is excessive in view of the purpose behind the punishment. Mr. Justice Marshall, based upon his intuition and speculation (see Footnote 163, 408 U. S. at 369, 92 S. Ct. at 2793, 33 L.Ed.2d at 423), is of the opinion that the death penalty is both excessive and morally unacceptable to the people of the United States and hence its imposition is unconstitutional per se.

The system in Maryland under which the death penalty is imposed is different from the systems used in Georgia and Texas—the systems involved in *Furman*. In both Georgia and Texas, the jury, in a single proceeding, determines guilt and also imposes punishment. In Texas, the jury establishes the penalty in both murder and rape cases in its sole discretion, see Texas Penal Code Annotated, Articles 1189 and 1257. In Georgia, the jury has a broad discretion in sentencing in a rape case, see Georgia Criminal Code 26-2001; and in murder cases, the jury chooses between the imposition of a sentence of death or life imprisonment. Georgia Criminal Code 26-1101.

In Maryland, however, the *trial judge* imposes the sentence in all murder and rape cases in accordance with the common law practice; but in murder cases, the jury pursuant to Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 413 may add the words "without capital punishment" in which event no sentence of death can be imposed by the trial judge. In rape cases in Maryland, the jury may also add the words "without capital punishment" in accordance with the provisions of Art. 27, § 463; and in this event, the trial judge may not impose a sentence exceeding 20 years in the penitentiary. It is

thus seen that the basic responsibility for sentencing in both murder and rape cases is given to the trial judge, thus continuing the common law tradition in this regard, subject to the limitations mentioned. Surely, the Supreme Court is not prepared to rule that it is unconstitutional to vest the power of sentencing in murder and rape cases in judges! The Maryland system is most certainly constitutional under the holding of the Supreme Court in *McGautha, supra;* and, as already observed, the majority of the Supreme Court in *Furman* does not purport to overrule that holding.

In sum, the Maryland law in regard to the death penalty was not before the Supreme Court in *Furman;* the State of Maryland has never briefed, argued or been otherwise heard before that Court upon the constitutionality of the Maryland law in this regard; nothing in the opinions of three of the five "concurring" justices would require this Court to hold the Maryland law unconstitutional or the death sentence in *Bartholomey* and the other cases invalid. In my judgment, therefore, we are obligated at this point to sustain the Maryland law and to adhere to our prior decisions sustaining the imposition of the death sentences in *Bartholomey* and the other cases.

It has been suggested that if, as and when issues in regard to the constitutionality of the Maryland law relating to capital punishment and the validity of the sentences here involved *are* presented to the Supreme Court for decision, the majority of that Court will find the Maryland law unconstitutional and those death sentences invalid. Hence, it is argued, we should now anticipate that result. I have already indicated my opinion in regard to the folly, if not the impossibility of attempting to do this. More importantly, however, as I see it, we are not at liberty to attempt this inasmuch as in the absence of an existing holding by the Supreme Court to the contrary our constitutional obligation is to sustain the validity of the Maryland law and our prior decisions relating to the sentences.

In the *Furman* case, there are several additional reasons why this Court should not extend or seek to anticipate future decisions of the Supreme Court in regard to the constitutional validity of capital punishment:

1. The general constitutional validity of all death sentences has not *yet* been determined by the Supreme Court, only two justices, Brennan and Marshall, being of the opinion that *all* death sentences are invalid. Indeed, seven of the nine justices indicated that in certain situations such sentences may be validly imposed.

2. *McGautha, supra,* decided May 3, 1971, has not been overruled in *Furman* and, for many relevant issues, is still the controlling law. Although the Supreme Court, during the last decade, has indeed substantially departed from a proper application of the doctrine of *stare decisis,* it is still the essence of the judicial process. In any event, *we* are not at liberty, in my opinion, to depart from it.

3. Seven of the nine justices in *Furman* indicate their belief that the States may validly consider the death penalty to be an effective deterrent to the crimes of murder and rape. The General Assembly of Maryland so considers it. The uncertainty in regard to what the Supreme Court would ultimately decide in regard to the constitutional validity of the death sentences has undoubtedly, in my opinion, been a prime cause in a decline in the imposition of such sentences and, when imposed, the execution of those sentences. What has been the result? Has murder and rape decreased during the past 15 years? On the contrary, the commission of these crimes has greatly increased.

In my dissenting opinion in *State v. Barger,* 242 Md. 616, 628 at 642-44, 220 A. 2d 304, 311 at 319-20 (1966), I stated in regard to murder and other unlawful homicides:

> ". . . This is not the time to weaken the position of the State in its prosecution of unlawful homicide in Maryland. The Uniform Crime Reports for 1964 issued by the Federal Bureau of

Investigation on July 26, 1965 give alarming figures in regard to the increase of crime generally in the United States and also in regard to murder and non-negligent manslaughter in the State of Maryland.

"A comparison of criminal offenses and the growth of population in the United States with the year 1958 indicates that from 1959 to 1964 criminal offenses increased 58% and the crime rate (the number of offenses per 100,000 population) increased 44%. Of these criminal offenses violent crime increased 40%, while the crime *rate* for crimes of violence increased 27%; crimes against property increased 61% while the rate of property crimes increased 46%. During the period in question, the population increased only 10%. In 1964 the number of willful killings increased 8% over 1963. The national murder rate was 4.8 killings per 100,000 persons in 1964. The 9,250 victims of murder was the highest number since the post-war year of 1946 and the annual increase in murder in 1964 over 1963 represents the sharpest trend for crime in recent years."

\* \* \*

"In addition to the national crime figures, Maryland in 1964 had a very high rate of murder and non-negligent manslaughter. Maryland's rate was 6.7 per 100,000 inhabitants, as compared with the national rate of 4.8. This is more than 100% higher than the rate of Pennsylvania (3.3), New Jersey (3.1) and West Virginia (3.7). It is more than 50% higher than that of Delaware (4.3) and is approximately 46% higher than that of New York (4.6). Only 12 States in the nation have rates in excess of the Maryland rate, i.e., Alabama, Alaska, Arkansas, Florida, Georgia, Louisiana, Mississippi, Nevada, North Carolina, South Carolina, Texas

and Virginia, the latter State being only slightly higher (6.8). Surely we should not weaken at this time the State's enforcement of the criminal law in regard to murder."

Since the dissenting opinion in *Barger,* filed June 8, 1966, the situation in regard to the crime of murder and also in regard to the crime of rape has become far worse. An examination of the Uniform Crime Reports issued by the Federal Bureau of Investigation for the years 1969, 1970 and 1971 discloses the following. In 1969, there were an estimated 14,590 murders in the United States, a numerical increase of 940 over the 13,650 murders recorded in 1968. This represents a 7% increase in murders in 1969 over 1968. It also represents a murder rate of 7.2 victims per 100,000 inhabitants as compared with a 6.8 murder rate in 1968. In 1970, there were a recorded 15,860 murders committed in the United States, a numerical increase of 1,270 over the 14,590 recorded murders in 1969 and an 8% increase. It also represents a murder rate of 7.8 victims per 100,000 inhabitants, an 8% increase over the 7.2 murder rate for 1969. In 1971, there were an estimated 17,630 murders committed in the United States, a numerical increase of 1,770 over the 15,810 murders in 1970 and an 11% increase. It also represents a murder rate of 8.5 victims per 100,000 inhabitants, a 9% increase over the 7.8 murder rate in 1970.

During the same period, Maryland's murder rate was well in excess of the national murder rate per 100,000 inhabitants. The comparative figures are: 1969, Maryland 9.3, United States as a whole 7.2; 1970, Maryland 9.2, United States 7.8; 1971, Maryland 11.2, United States 8.5. From 1964, when the murder rate in Maryland was 6.7, the murder rate has increased to 11.2 in 1971, a 69% increase in the Maryland murder rate during this seven year period during which period no sentence imposing the death penalty for murder was executed in this State.

When the crime of rape is considered, the figures are

even more alarming. During 1969, there were an estimated total of 36,470 forcible rapes in the United States, an increase of 5,410 over 1968, an increase of 17% over 1968 and 116% over 1960. The crime rate figures indicate that in the United States during 1969, the crime rate for forcible rape was 18.2, an increase of 17% over 1968; during 1970, a crime rate of 18.5, a 1% increase over 1969; and, in 1971, a crime rate of 20.3, an increase of 10% over 1970.

Again, Maryland is far above the national crime rate: in 1969, Maryland 29.9, United States 18.1; 1970, 23.9, United States, 18.3; 1971, 24.9, United States, 20.3. From 1960 to 1971, there has been a 113.7% increase in forcible rape in Maryland and again during that period no sentence imposing the death penalty for rape was executed in this State.

There has been some adverse criticism of the Crime Reports recently on the ground that they *understate* the number of crimes committed in the United States. If this criticism is sound, the actual crime figures would be even more alarming. In any event, in view of the fact that seven justices of the Supreme Court agreed in *Furman* that the imposition and execution of the death penalty *is a deterrent* to the commission of murders and rapes, should not its use now be expanded and most certainly not eliminated?

4. The Supreme Court is in error in imposing the limitations of the Eighth Amendment upon the States allegedly through the Fourteenth Amendment, and this error should most certainly not be *extended and expanded* by this Court.

As I stated in my dissenting opinion in *State v. Giles,* 245 Md. 660, 667-68, 229 A. 2d 97, 101 (1967):

> "I am profoundly disturbed with what I believe to be the unwarranted expansion of federal judicial power over the States and their judiciary by construing the due process clause in the Fourteenth Amendment to include many

of the limitations of the first eight amendments to the federal Constitution, and a new interpretation of the equal protection clause in the Fourteenth Amendment. My views in regard to what I believe to be unwarranted extensions of federal judicial power have already been fully expressed by me in prior dissenting and concurring opinions and need not be repeated here. See *Truitt v. Board of Public Works,* 243 Md. 375, 411, 221 A. 2d 370, 392 (1966) ; *State v. Barger,* 242 Md. 616, 628, 639-44, 220 A. 2d 304, 311, 317-19 (1966) ; *Montgomery County Council v. Garrott,* 243 Md. 634, 650, 653, 222 A. 2d 164, 172, 176 (1966) ; *Hughes v. Maryland Committee for Fair Representation,* 241 Md. 471, 491-513, 217 A. 2d 273, 385-98 (1966)."

As was pointed out in our opinion in *Bartholomey, supra,* our predecessors held in *Foote v. State,* 59 Md. 264 (1883) that the Eighth Amendment did not apply to the States but only to Congress, relying upon *Pervear v. Commonwealth,* 72 U. S. (5 Wall.) 475, 479-80, 18 L. Ed. 608, 609-10 (1867). *Pervear* was cited with approval and followed by the Supreme Court in *O'Neil v. Vermont,* 144 U. S. 323, 332, 12 S. Ct. 693, 697, 36 L. Ed. 450, 456 (1892). The Supreme Court had held to the same effect in *In re Kemmler,* 136 U. S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890) in which Mr. Chief Justice Fuller, for the Supreme Court, in a case involving the validity of a New York statute directing that the death penalty be carried out by electrocution, stated: "It is not contended, as it could not be, that the Eighth Amendment was intended to apply to the States . . . ." Later it was pointed out that the New York statute did not offend the "privileges and immunities" clause and the "due process" clause of the Fourteenth Amendment.

One would suppose that with three opinions of the Supreme Court decided over a 36-year period that the Eighth Amendment did not apply to the States, that is-

sue would be considered settled and so it was until the decision of the Supreme Court in *Robinson v. California,* 370 U. S. 660, 666, 82 S. Ct. 1417, 1420, 8 L.Ed.2d 758, 763 (1962), supposedly relying upon *Francis v. Resweber,* 329 U. S. 459, 463, 473-74, 67 S. Ct. 374, 376, 381, 91 L. Ed. 422, 426, 431-32 (1947), announced that the Eighth Amendment did apply to the States through the Fourteenth Amendment. In *Francis v. Resweber,* it is stated that a cruel punishment was within the purview of the due process clause of the Fourteenth Amendment but there is no statement to the effect—and certainly no holding—that the Eighth Amendment applied to the States through the Fourteenth Amendment. No mention is made of the prior opinions of the Supreme Court in *Pervear v. Commonwealth, In re Kemmler* or *O'Neil v. Vermont* and, of course, they were not distinguished or overruled. Nor are those cases mentioned in *Robinson v. California.* In *Furman,* Mr. Justice Douglas relies on *Francis v. Resweber* and *Robinson v. California* to indicate that the Eighth Amendment ban against cruel and unusual punishments as applicable to the States through the due process clause of the Fourteenth Amendment is "now settled." 408 U. S. at 241, 92 S. Ct. at 2727-28, 33 L.Ed.2d at 351. But how was it "settled"? By the *ipse dixit* in opinions which disregarded prior decisions of the Supreme Court to the contrary. In my opinion, this type of "boot strap" extension of jurisdiction over the States by the Supreme Court is absolutely impermissible and most certainly the State Courts should not expand and enlarge such jurisdiction thus acquired.

5. The Supreme Court justices indicating that the death penalty executed by the usual and accepted methods is a cruel and unusual punishment under the Eighth Amendment are clearly in error and, in this regard, have indulged in an extraordinary departure from *stare decisis.* We should not extend or expand this error.

Mr. Chief Justice Burger puts it well in his dissenting opinion in *Furman,* as follows:

"Counsel for petitioners properly concede that

capital punishment was not impermissibly cruel at the time of the adoption of the Eighth Amendment. Not only do the records of the debates indicate that the Founding Fathers were limited in their concern to the prevention of torture, but it is also clear from the language of the Constitution itself that there was no thought whatever of the elimination of capital punishment. The opening sentence of the Fifth Amendment is a guarantee that the death penalty not be imposed 'unless on a presentment or indictment of a Grand Jury.' The Double Jeopardy Clause of the Fifth Amendment is a prohibition against being 'twice put in jeopardy of life' for the same offense. Similarly, the Due Process Clause commands 'due process of law' before an accused can be 'deprived of life, liberty or property.' Thus the explicit language of the Constitution affirmatively acknowledges the legal power to impose capital punishment; it does not expressly or by implication acknowledge the legal power to impose any of the various punishments that have been banned as cruel since 1791. Since the Eighth Amendment was adopted on the same day in 1791 as the Fifth Amendment, it hardly needs more to establish that the death penalty was not 'cruel' in the constitutional sense at that time.

"In the 181 years since the enactment of the Eighth Amendment, not a single decision of this Court has cast the slightest shadow of a doubt on the constitutionality of capital punishment. In rejecting Eighth Amendment attacks on particular modes of execution, the Court has more than once implicitly denied that capital punishment is impermissibly 'cruel' in the constitutional sense. *Wilkerson v. Utah,* 99 U. S. 130, 25 L. Ed. 345 (1878) ; *Louisiana ex rel. Francis v. Resweber,* 329 U. S. 459, 464, 67 S. Ct. 374,

376, 91 L. Ed. 422 (1947). *In re Kemmler,* 136 U. S. 438, 10 S. Ct. 930, 34 L. Ed. 519 (1890) (dictum). It is only 14 years since Mr. Chief Justice Warren, speaking for four members of the Court, stated without equivocation,

" '. . . Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty.' *Trop v. Dulles,* 356 U. S., at 99, 78 S. Ct., at 597.

"It is only one year since Mr. Justice Black made his feelings clear on the constitutional issue:

" 'The Eighth Amendment forbids "cruel and unusual punishments." In my view, these words cannot be read to outlaw capital punishment because that penalty was in common use and authorized by law here and in the countries from which our ancestors came at the time the Amendment was adopted. It is inconceivable to me that the framers intended to end capital punishment by the Amendment.' *McGautha v. California,* 402 U. S. 183, 226, 91 S. Ct. 1454, 1477, 28 L.Ed.2d 711 (1971) (concurring opinion).

"By limiting its grants of certiorari, the Court has refused even to hear argument on the Eighth Amendment claim on two occasions in the last four years. *Witherspoon v. Illinois,* cert. granted, 389 U. S. 1035, 88 S. Ct. 793, 19 L.Ed.2d 822, rev'd, 391 U. S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968) ; *McGautha v. California,* cert. granted, 398 U. S. 936, 90 S. Ct. 1846,

26 L.Ed.2d 267 (1970), aff'd, 402 U. S. 183, 91 S. Ct. 1454, 28 L.Ed.2d 711 (1971). In these cases the Court confined its attention to the procedural aspects of capital trials, it being implicit that the punishment itself could be constitutionally imposed. Nonetheless, the Court has now been asked to hold that a punishment clearly permissible under the Constitution at the time of its adoption and accepted as such by every member of the Court until ·today, is suddenly so cruel as to be incompatible with the Eighth Amendment."
408 U. S. at 380-82, 92 S. Ct. at 2799-2800, 33 L.Ed.2d at 430-31.

For all of these reasons, I would reaffirm our prior decisions sustaining the validity of the death sentences imposed in *Bartholomey* and the companion cases.

Judge Smith concurs in this dissent.

*Smith, J., dissenting:*

I concur in the dissent of Judge Barnes, but I would add a few words of my own.

In a matter of constitutional proportions I do not think we should be placed in the position of having to guess at the holding of the highest Court in the land. In the absence of a clear cut holding from the Supreme Court of the United States on the death penalty arising from a state where, as in Maryland, the penalty is specified not by a jury, but by a judge or judges, and arising under circumstances approaching our cases, guessing is exactly what we are doing.

The majority in their opinion confirm the analysis of *Furman* by Judge Barnes when they say:

"Justice Douglas concluded that statutes like those involved in *Furman* which permitted discretion in the imposition vel non of the death penalty were unconstitutional in their operation, as infrequently and arbitrarily applied to unpopular groups, thereby violating the principle of equal protection implicit in the Eighth

Amendment's ban on cruel and unusual punishment."

I know that many changes have taken place in recent years, including changes in the methods of teaching mathematics—since my school days. I believe, however, that even in the "new math" currently in vogue 4 + 1 still equals 5 and 5 — 1 still equals 4. It is obvious that without the holding of Mr. Justice Douglas a majority of the Court did not hold the death sentence invalid. Therefore, it becomes of great importance to ascertain whether his views as applied to the Maryland system and Bartholomey would permit the imposition of the death sentence, because, if they would, his one vote added to the four who dissented would equal a majority.

As was so ably pointed out by Judge Barnes, it is obvious that Bartholomey was not part of an unpopular group. Moreover, if the death sentence has been infrequently applied in recent years, it is because of the challenges to its validity that were pending in the Supreme Court and the desire of the constituted authorities not to proceed with an execution until those challenges ultimately were decided.[1] Yet another factor is the seemingly endless litigation in criminal cases, much of it fostered by the federal system.[2]

The death sentences in *Bartholomey* and the other

---

1. I can quickly count four cases in the space of one year decided by this Court in which we affirmed convictions upon which trial courts had directed that the death penalty be imposed, *Bartholomey;* Wilson v. State, 261 Md. 551, 276 A. 2d 214 (1971); Gilmore v. State, 263 Md. 268, 283 A. 2d 371 (1971); and Brice v. State, 264 Md. 352, 286 A. 2d 132 (1972). Accordingly, one wonders how the term "infrequently" is defined. In *Gilmore* the distinguished trial judge who heard the case and who had extensive experience as a trial lawyer in criminal cases said in imposing sentence:

" 'The evidence offered in this case concerning the manner and means of the decedent's death are the most extensive and vicious that this Court has ever had brought to its attention as either, in its earlier days as a prosecutor, in its later days as a defense counsel in criminal cases, or since I have been a member of this Bench.' " *Id.* at 272-73.

2. An apt example is that of Johnnie Brown, tried and convicted of having murdered a Salisbury police officer in 1958. *See* Brown v. State, 225 Md. 349, 170 A. 2d 300, 85 A.L.R.2d 1107 (1961); the same Brown involved in cases reported in 228 Md. 654, 179 A. 2d 419 (1962); 230 Md. 629, 186 A. 2d 595 (1962),

cases here were not imposed as in *Furman* by a jury, but by a judge or judges, just as every other criminal sentence in Maryland is imposed and has been imposed for generations. There was nothing arbitrary about them.

At least since before this member of the Court was born Maryland has been sufficiently enlightened to not have a mandatory death sentence. I would hate to see us go to a system where the judge as the sentencing authority was divested of all discretion in imposing sentence. The Gallup poll tells us a majority of the American people desire that in certain types of criminal cases the death sentence be permitted.[3] We have just seen the results of the recent California voting upon the subject. Short of a constitutional amendment upon the matter, under the holding of the majority there may be no death sentence unless the statute makes the sentence mandatory, a procedure which may make convictions more difficult to obtain.

I sincerely believe that the Maryland system as heretofore practiced would have received the approval of a majority of the Supreme Court. I believe the dissenting 4 + 1 of Mr. Justice Douglas equals 5 or a majority that would uphold the death sentence as imposed upon Bartholomey.

It is unfortunate that by today's holding we shall never know whether the Maryland system, one that differs radically from that in the cases before the Supreme Court, would have received its approval.

---

cert. den. 372 U. S. 960 (1963); 217 F. Supp. 547 (D. Md. 1963); 334 F. 2d 9 (4th Cir. 1964), cert. den. 379 U. S. 917 (1964); 346 F. 2d 149 (4th Cir. 1965), cert. den. 382 U. S. 910 (1965); 248 F. Supp. 342 (D. Md. 1965); 245 Md. 679, 226 A. 2d 333 (1967); 264 F. Supp. 528 (D. Md. 1967), aff'd by the U. S. Court of Appeals for the Fourth Circuit on September 22, 1967, cert. den. 390 U. S. 992 (1967); and 266 Md. 196, 292 A. 2d 645 (1972). He is the same Brown to whom reference is made in footnote 18 of the majority opinion.

3. In State of Delaware v. Dickerson, 298 A. 2d 761, 765 (Del. 1972), Justice Herrmann pointed out that capital punishment was abolished in that state in 1958 and reinstated in 1961. Living as I do within a few miles of the Delaware line and being a subscriber to a Delaware daily newspaper, I well recall the public outcry against the abolition of the death sentence which led to its reinstatement.