# TYRONE STEVEN HENRY *v.* STATE OF MARYLAND

[No. 211, September Term, 1973.]

*Decided February 27, 1974.*

The cause was argued before THOMPSON, MOYLAN and DAVIDSON, JJ.

*Robert W. Baker* for appellant.

*John P. Stafford, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Sandra O'Connor* and *James Sherbin, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court. DAVIDSON, J., concurs and dissents and filed a concurring and dissenting opinion at page 311 *infra.*

The appellant, Tyrone Steven Henry, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge Anselm Sodaro, of larceny of an automobile and the receipt of $16 in stolen cash. The same jury acquitted the appellant of the murder of Benjamin Rubin, the assault with intent to murder Shirley Rubin, and the armed robbery of Shirley Rubin. Upon this appeal, the appellant challenges the procedure by which the jury verdict was rendered and the propriety of the ultimate sentence.

We will look first to the rendering of the verdict by the jury. The jury returned its verdict at 6:25 p.m. In addition to the various acquittals, it announced convictions on three charges. Under indictment 3157, it convicted the appellant on the seventh count, charging him with the unlawful receipt of $16 stolen from Shirley Rubin. Under indictment 3163, it convicted the appellant under the first and third counts, charging, respectively, the larceny of an automobile and the unauthorized use of the same automobile. After the jury was polled, at the request of the State, as to the murder charge, all of the verdicts were hearkened to at 6:30 p.m. and the jury was excused. Immediately thereafter, the following colloquy took place:

"THE COURT: Mr. Baker?

MR. BAKER: Well, I believe the verdicts as to Indictment 3163 are inconsistent.

THE COURT: Well, we'll bring the jury back if you're going to claim they're inconsistent. Let's

bring the jury back. You mean the larceny of the automobile?

MR. BAKER: May we approach the bench?

THE COURT: Yes.

(OFF RECORD BENCH CONFERENCE)

THE COURT: Is the jury out there? We'll have to bring them back.

(Thereupon, at 6:32 P.M. the jury resumed the jury box.)

THE COURT: Members of the jury, I'll have to ask you to take your seats again, please. Members of the jury, I regret to have to ask you to do this. I'm going to ask you to go back to your jury room and consider indictment 3163 in which you found the defendant guilty on the first count of stealing a car, not guilty of receiving stolen goods, and guilty on the third count of the indictment. I'm going to ask you to go back to your jury room and consider and make a choice between the first count and third count of that indictment.

(Thereupon, at 6:33 P.M., the jury retired to the jury room for further deliberation.)

(Thereupon, at 6:35 P.M., the jury resumed the jury box.)"

The jury's verdict was that the appellant was guilty of the larceny of the automobile and not guilty of its unauthorized use. These verdicts were hearkened to and the jury was again excused. No objection was made by the appellant to the recall of the jury or to any of the proceedings following that recall.

Appellant contends that his larceny conviction is invalid. He maintains that when the verdict of the jury that he was guilty of both larceny and unauthorized use of the same automobile was hearkened to and recorded, it became final and could not thereafter be altered or amended. He concludes that because these two convictions are inconsistent, they cannot be permitted to stand.

We note that the appellant called the judge's attention to

the alleged inconsistency after the jury had been excused. He interposed no objection to the jury's recall and reconstitution nor to any of the subsequent proceedings. The challenge to the procedure was, therefore, not raised and ruled upon below. We eschew easy reliance upon Maryland Rule 1085, however, because of our belief that even the initial verdicts were not inconsistent. Unauthorized use is, we hold, a lesser included offense within its parent crime of larceny and, as such, a conviction therefor merges into a conviction for the greater, parent crime.

### The Relationship Between Larceny and Unauthorized Use

The Unauthorized Use Statute, Article 27, § 349, is a companion and supplemental section to Article 27, § 348, proscribing the larceny of various means of locomotion, animal or mechanical. The lesser misdemeanor parallels the greater felony in all respects, except that the lesser crime does not include the element of *animus furandi* — the intent to deprive the owner permanently of the goods. The lesser crime, throughout the common law world generally, was a latecomer and was devised to plug a loophole in the law, respecting those cases where trespassory takings had occurred but where the *animus furandi* was absent or difficult of proof. In looking at Unauthorized Use statutes generally, *Perkins on Criminal Law* (2d ed. 1969) points out, at 273, that these statutes contain all the elements of larceny except that of an *animus furandi:*

> "This statutory crime, whether called 'larceny' or not, is in effect an 'included offense.' It has all of the elements of larceny except the intent to steal, and is limited to a small portion of the general subject matter of larceny."

In *Robinson v. State,* 17 Md. App. 451, 455-456, 302 A. 2d 659, we traced the background, history and purpose of the Maryland Unauthorized Use Statute:

> "The purport of Article 27, § 349, can best be appreciated after a thumbnail sketch of how it

came to be. It is an offshoot of § 348 and shares with it an ancestry tracing back to 1547. Horse stealers were more threatening to the pillars of Tudor society than other mere thieves. Chapter 13 of the Acts of 1 Edw. VI removed the benefit of clergy from them, thereby condemning them to the gallows. In 1744, the Colonial Assembly of Maryland brought over the English horse stealing statute with its penalty of 'death as a felon without benefit of clergy'. In 1799, coverage was extended to cover the theft of a 'jack, jenny or mule'. Subsequent amendments added sundry varieties of livestock and wagons to the protected list of chattels. In 1809, the maximum penalty was lowered to fourteen years in the penitentiary. *The present Unauthorized Use shoot branched off from the parent stem in 1880. It filled the gap sometimes left by the absence in the unlawful taker of an animus furandi.* It applied to 'any person . . . who shall . . . take and carry away out of the custody or use of any person . . . any horse, mare, colt, gelding, mule, ass, sheep, hog, ox or cow, or any carriage, wagon, buggy, cart or any other vehicle' though taken for his 'present use, and not with the intent of appropriating or converting the same.'" (Emphasis supplied.)

The pertinent language of the present § 349, defining the offense, has not departed from that of the Act of 1880. There is no establishment of an affirmative "temporary intent" as a necessary element of the lesser crime, but only the pointed absence of the element of "permanent intent" contained in the greater crime of larceny. The main clause of the section makes no mention of intent of any sort. That main clause is followed by a clarifying subsidiary clause negativing the *animus furandi:*

". . . although it may appear from the evidence that such person or persons, his or their aiders and abettors, took and carried away the property . . . for

his or their present use, and not with the intent of appropriating or converting the same."

Although this negative notion of "no *animus furandi*" is sometimes casually described in such affirmative terms as "an intent to deprive the owner of the goods temporarily" or "an intent to deprive the owner of the goods less than permanently," we think it clear that conceptually the lesser offense simply lacks one additional element possessed by the greater offense, and does not establish an affirmative, alternative special *mens rea* of its own. It was to this point that this Court addressed itself in *Robinson v. State, supra*, at 17 Md. App. 456:

"The 'Unauthorized Use Statute' is similar to its senior counterpart in all respects except that there is no element of 'an intent permanently to deprive the possessor of the item taken.' "

The same analysis was reaffirmed by us in *Shope v. State*, 18 Md. App. 472, 475, 307 A. 2d 730:

"Where there is no *animus furandi*, there is no larceny. *Farlow v. State, supra*, 518. With respect to certain classes of chattels, however, including for present purposes automobiles, the gap created by the lack of intent permanently to deprive the owner of his goods was filled by the enactment of the offense of unauthorized use."

We there dealt with what would have been a "larceny by trick" except for the fact that the *animus furandi* was lacking. We held, under the circumstances, that there had been an unauthorized use. We said, at 18 Md. App. 476-477:

"In deciding, therefore, whether the appellant, as the assumed lessee of the Ford Mustang, was guilty of unauthorized use, we must ask ourselves whether all elements of the crime of larceny have been established, saving only that of the *animus furandi*. . . .

. . . .

The appellant committed what would have been 'larceny by trick.' had there been an *animus furandi*. It follows, we hold, that the appellant did, therefore, perpetrate an unauthorized use, absent the *animus furandi*."

Those who conceive of the lesser crime as inconsistent with, rather than subsumed within, the greater, are ensnared in a semantic trap which recurs with nagging frequency — the expression of a negative notion in affirmative terms. When a crime is defined simply as embracing one less element than a greater crime, the lesser companion abuts its senior counterpart in a tight fit, with no attendant conceptual problems. When, on the other hand, the absence of the additional element is informally described in the affirmative terms of some lesser element, and when that affirmative description is judicially elevated into a formal definition,[1] the lesser and greater offenses do not abut cleanly. There is left between them a theoretically possible "no man's land" where a state of equal balance in the proof between the greater and lesser elements would render conviction of either crime beyond a reasonable doubt impossible.[2]

The relationship between common law burglary and daytime housebreaking provides a perfect example of such semantic difficulty. Daytime housebreaking statutes were devised to fill the gap in the law where the "nighttime" element of burglary was either non-existent or could not be shown. In the remedial statutes, however, did the use of the word "daytime" contemplate an alternative element which must, as any other element of the crime, be affirmatively shown, or did "daytime" mean simply "anything less than

---

1. A mistake thus enshrined in case law is no less a mistake; it is simply harder to root out.

2. Our end result, of course, is programmed into us subconsciously with our very starting point semantically. In contrasting an *actus reus* coupled with a minor special *mens rea* with that same *actus reus* coupled with a more major special *mens rea*, if we start off thinking of the minor vis-a-vis the major as "a lesser intent," we ineluctably reach one result; if we start off conceiving of it as "a contrary intent," we ineluctably reach the opposite result. We opt for the "lesser" rather than the "contrary" conceptualization whenever the lesson of history is that the minor crime was devised to provide for a gap in proof of the major crime.

demonstrated nighttime?" Georgia became mired in literalism and reversed a conviction for daytime housebreaking because the evidence did not show clearly that the offense occurred "in the daytime." In *Jones v. State*, 63 Ga. 141 (1879), it was held, "To prove a burglary was committed in the day or in the night, one or the other, is certainly not to prove beyond a reasonable doubt that burglary in the daytime was committed."

This Court, however, in line with more enlightened thought, set its face against such an absurdity in *St. Clair v. State*, 1 Md. App. 605, 232 A. 2d 565. We there adopted the holdings of *Ledger v. State*, 285 S.W.2d 130 (Tenn. 1955), and *State v. Newell*, 106 A. 561 (Vt. 1919), to the effect that "burglary in the second degree was not a different offense from common-law burglary but was merely a lesser degree of the same offense" and that "when the proof fails to show the time of the offense then the burglar may be punished under the statute providing the lesser penalty." Absent such better conceptualization, a bonanza would have been created for some clever "twilight burglar" or for one who simply broke and entered at some undesignated time within a 24-hour period, whereby he could not be shown beyond a reasonable doubt to have perpetrated either of two mutually exclusive, alternative offenses, notwithstanding that he unquestionably committed one or the other of them.

No more than with the case of the hypothetical "twilight burglar," will the law tolerate, in our judgment, the absurdity that where proof is in equal balance as to whether a trespassory taker had an *animus furandi* or some lesser intent, the trespassory taker must go scot-free, because neither alternative is established beyond a reasonable doubt. There is no eye in the hurricane of culpability. Unauthorized use is a lesser included offense in the greater crime of automobile larceny. The guilty verdicts upon both counts were not, therefore, inconsistent, but simply represented a merger, wherein the greater crime subsumed the lesser.[3]

---

**3.** We are not unmindful of *Fletcher v. State*, 231 Md. 190, 189 A. 2d 641, but believe that its unquestionably correct holding (that convictions for both receiving stolen goods and the unauthorized use of those goods would be inconsistent) finds sounder support in the distinction that an

In defining criminal conduct, particularly when dealing with related offenses, we must never lose sight of the subtle but conceptually critical distinctions 1) between non-proof of permanent intent and proof of non-permanent intent; 2) between non-proof of nighttime and proof of non-nighttime; and 3) between non-proof of consummation and proof of non-consummation.[4] Verbal lapses, judicially enshrined, can haunt the future.

## The Sentencing

Some of the factual background of the crimes for which the appellant went to trial is necessary to place the sentencing issue in proper perspective. At the trial, there was evidence to show that during the early afternoon of April 19, 1972, the appellant stole an automobile belonging to Henry Shroeder. Shortly thereafter, he picked up two passengers, Herbert McDonald and Edward Minor. At approximately 3 p.m., the appellant drove McDonald and Minor to a local neighborhood grocery store, owned by Benjamin and Shirley Rubin. The appellant was familiar with the store, whereas McDonald and Minor were not. McDonald and Minor got out of the car, went into the store, purchased some cigarettes or soda and returned to the car.

The appellant then continued to drive the other two around for a short time, whereafter McDonald and Minor indicated that they wanted some more soda, candy or cigarettes. At approximately 4:30 p.m., the appellant drove the car back to the Rubins's store where he parked. McDonald and Minor entered the store and therein perpetrated an armed robbery. Benjamin Rubin was killed. Shirley Rubin was wounded. Approximately $125 was taken. McDonald and Minor ran to the car where the appellant was waiting, and the appellant drove quickly away. The appellant testified that while waiting in the parked car, he had heard some shots. He testified that McDonald and

---

unauthorized use involves the element of trespassory taking, whereas the receipt of stolen goods affirmatively precludes such an element, requiring rather that the receiver take *from* the trespassory taker.

4. But see *Boone v. State,* 2 Md. App. 80, 114-115, 233 A. 2d 476.

Minor, after rejoining him in the car, told him that "the woman got shot twice and the man was shot once." McDonald passed a gun to Minor. McDonald gave $16 to the appellant.[5]

The appellant contends that his sentences of fifteen years for automobile larceny and three years for receiving stolen goods, to be served consecutively, were unconstitutionally imposed. He maintains that while the jury found him not guilty of the murder of Benjamin Rubin and of the assault and armed robbery of Shirley Rubin, the judge in sentencing him considered him guilty of these offenses and consequently imposed the maximum penalty available. He argues that, given his age and prior record,[6] there was no justification of the imposition of such lengthy sentences. He concludes that the imposition of sentences, at least in part, on the basis that he was in fact guilty of crimes for which he had been acquitted by the jury denied him due process of law.

The appellant, to be sure, can find arguable support for his position if he takes, as he does, isolated passages from the judge's fully articulated rendition of sentence selectively out of context:

> "I will say I certainly do feel entirely different when they return a verdict of not guilty of murder and armed robbery ... I consider this defendant the commander of the troops and the pilot of the automobile ... [I]t was he who masterminded and engineered the holdup ... It is indicated to me very clearly he not only actively participated in the robbery and the ensuing murder ..."

A reading in full context, however, reveals to us that Judge Sodaro considered the highly trustworthy evidence which had been produced before him, as well as before the jury,

---

5. In separate jury trials, McDonald and Minor were convicted of murder in the first degree.

6. The appellant was 18 years of age. His prior record consisted of a conviction for driving a car with stolen license plates "or something relating to that" and a juvenile offense "relating to auto larceny or unauthorized use, a related type of offense." The appellant had apparently never been in jail prior to his arrest in the instant case.

only for such bearing as that evidence legitimately had upon the aggravated nature of the two offenses on which he was required to pass sentence pursuant to the verdicts of the jury.

Whatever the verdict of a jury as to certain charges, it is clear that that verdict is not *res judicata* upon the judge to the extent to which any legitimate fact-finding function remains lodged in him. The clear lesson of *Scott v. State*, 238 Md. 265, 208 A. 2d 575, is that a judge, for his proper purposes, may determine that certain conduct did occur, even when the jury has determined, for its distinct purposes, that such conduct was not proved beyond a reasonable doubt. In *Scott*, a jury acquitted the defendant there of certain criminal charges. Notwithstanding that acquittal, Judge Harris revoked probation upon the basis of the same evidence, which persuaded him that the criminal conduct had occurred. The Court of Appeals affirmed. It pointed out, *inter alia*, that for certain purposes, such as revoking probation or assessing the gravity of the offense in determining sentence, the judge is not required to be persuaded of the fact to be proved beyond a reasonable doubt, whereas the jury, to convict, is required to be so persuaded. As to the non-binding effect of the jury verdict upon the judge, the Court there said, at 238 Md. 276:

"The facts presented to or coming to the knowledge of the judge, as to the breach of the conditions of probation, need not establish guilt beyond a reasonable doubt as in criminal offenses; all that is required is that the facts before him be such that the judge reasonably could be satisfied that the conduct of the probationer has not been what he agreed it would be if he were given liberty.

These considerations underlie the decisions that hold or indicate that acquittal of a probationer of a charge of criminal conduct which was a violation of probation does not preclude revocation of probation, if the judge passing on the question is with reason satisfied that the probationer actually did that charged in the indictment on which he was

acquitted. The decision of the Supreme Court of Appeals of Virginia in *Marshall v. Commonwealth,* 116 S.E.2d 270 (1960), flatly so holds on facts quite like those in the case before us. Also see *State v. Greer* (N. C.), 92 S. E. 147; *People v. Kuduk* (App. Ct. Ill.), 51 N.E.2d 997, appeal dismissed, 57 N.E.2d 755; *Bernal-Zazueta v. United States,* 225 F. 2d 64 (9th Cir.) and Note, *Legal Aspects of Probation Revocation,* 59 Colum. L. R. 311, 332."

The *Scott* case, furthermore, makes clear the similarity between the process of sentencing and the process of revoking probation. It said, at 238 Md. 276:

"There is clearly a similarity between the process of determining a proper sentence originally and the process of determining whether to revoke probation and reinstate or impose a sentence, and the judge in the latter instance may, with similar safeguards, utilize the ways of acquiring knowledge bearing on the problem that the judge utilizes in determining a proper sentence originally."

The reliability of the information-gathering process, so frequently defective in sentencing hearings, was not in issue here. Judge Sodaro was relying upon direct testimony, under oath and subject to cross-examination, before him personally, where he had full opportunity to observe the demeanor of the witnesses and to assess their credibility. Indeed, even the dissenting opinion acknowledges that Judge Sodaro was "in possession of the reliable evidence presented at the trial concerning the details and surrounding circumstances relating to the murder of Mr. Rubin and the armed robbery and assault of Mrs. Rubin." The reliability of the fact-gathering process could not have been more assured.

It is beyond cavil that the actual conduct of pulling a trigger and taking money is not simply the operative conduct of the murder, robbery and assault charges, but is also, independently, consequential conduct flowing from the preceding automobile larceny, as well as preliminary

308

conduct leading to the receipt of the stolen proceeds of the robbery. The theft of the automobile and the receipt of the stolen goods were inextricably intertwined with the murder, the robbery and the assault, however the verdicts may have happened to fall. The consequences which flow from an offense have evidentiary value in determining the gravity of that offense. Unless and until the rehabilitation rationale utterly banishes from the field the retribution and deterrence rationales for punishment of criminal conduct, the gravity of an offense, both in terms of its purpose and in terms of its consequences, is not only a relevant, but a well-nigh indispensable, factor to be considered in determining the severity of a sentence.

Judge Sodaro disagreed, as was his prerogative, with the acquittals by the jury. He was painstakingly careful, however, to consider the murderous conduct only in terms of its aggravating effect upon the larceny. He made his purpose preeminently clear and carefully touched all bases. He considered the murder and the robbery simply as conduct bearing upon the other two charges, thereby adding significantly to their gravity.

Judge Sodaro's full and carefully worded opinion in the course of rendering the sentence well bespeaks the deliberate, as opposed to hasty, character of his decision. His prefatory remarks were meticulously explicit:

> "THE COURT: The remarks that I am about to make are not intended as a criticism of the jury's verdict in this case, to do so would be for naught at this stage of the proceedings although I will say I certainly do feel entirely different when they return a verdict of [not] guilty of murder and armed robbery. The remarks that I am about to make are merely to set forth on the record the reasons that I am imposing the sentence that I will in a few moments, and to make known to a panel of Judges who may have to review the sentence if the Defendant decides to file a petition for review of sentence."

On occasion after occasion, Judge Sodaro was then

punctilious in referring to the death of Mr. Rubin as an aggravating consequence of the larceny and not as a self-contained predicate for an independent sentence:

"It appears to me that if this Defendant had not stolen the car from the parking lot of the Baltimore Community College and hot wired it, Mr. Benjamin Rubin possibly would have been alive today. If this Defendant had not stolen the car and picked up his two companions, Mr. Benjamin Rubin possibly would have been alive today. . . . I will say although perhaps the ensuing murder was not anticipated by him or the others who may have been involved after riding around in that car to various parts of the city for no good reason at all with two companions, one of whom was armed. It was he — the Defendant — who brought the car and the companion to this locality the first time to ostensibly to permit the two to buy one pack of cigarettes with two persons making that purchase. After being in that store and returning to the car, it was he, the driver of the car, he was in full control of the movement of that car and the destination of that automobile that subsequently returned to the locality and the same grocery store ostensibly to permit his companions to buy a can of soft drink and in the course of this robbery Mr. Rubin was killed unnecessarily, and Mrs. Rubin was seriously injured unnecessarily."

When the consequences flowing from an automobile larceny are the death by gunshot of a man and the serious wounding of his wife, there is a gravity to the larceny not involved when the consequences are a minor automobile collision, a stripped hubcap or ripped-up upholstery. The gravity of the offense, in terms of these consequences, was a relevant consideration in assessing the appropriate sentence.

Judge Sodaro, moreover, found from all of the facts, as was his prerogative, that the purpose behind the larceny was to use the stolen automobile as an instrumentality in an armed holdup:

"I consider this Defendant the commander of the

troops and the pilot of the automobile. The record is clear that the other two defendants were not familiar with the neighborhood or the locality where the grocery store was situated, or indeed were they familiar with the grocery store, did they know the victim in this case; but it was the Defendant who was the pilot of this automobile, and being familiar with that locality and the store and the Rubins, whom he knew for many years to come, it was he who masterminded and engineered the holdup."

That purpose, legitimately ascertained, was certainly an element of aggravation to the automobile larceny above and beyond that present when the purpose of such theft is joyriding, general transportation without such a felonious objective, or even monetary gain. Judge Sodaro then turned to the aggravated character of the receipt of stolen goods:

"Not only was he familiar with the locality of the store, the people involved and being in full control of the movement of the car; but in addition thereon after having seen the robbery and after these two persons came back to his car he profited by the armed robbery to the extent that it developed in the course of the testimony. So, here is a man stealing a car and taking his companions to the locality and an armed robbery having been perpetrated and he profiting from the loot of the armed robbery."

To receive the stolen fruits of an armed robbery, wherein a man and a woman have been shot, even while driving the getaway car away from the scene, is an element of aggravation to the crime not present when one simply buys a "hot" television set at a bargain price days or weeks after the fact of larceny. There is a dimension of depravity in the former situation not present in the latter. The state of mind of the receiver is a relevant consideration in evaluating the gravity of his offense.

When the appellant filed an application for review of sentence, Judge Sodaro, by written memorandum, requested

that he not be appointed as a member of the review panel. In that memorandum, he reiterated clearly his reasons for imposing maximum sentences for the specific crimes of grand larceny and receiving stolen goods:

> "[M]uch to the shock and dismay of the court the jury found this defendant not guilty of murder and robbery with a deadly weapon, but guilty of larceny of the automobile used in the homicide and receiving stolen goods — part of the money taken in the course of the armed robbery.
>
> . . . .
>
> In view of the fact that it was the court's opinion that this defendant was the 'brains of the group' ; that he suggested the place to be robbed; that he operated the get-away car and received part of the proceeds of the robbery and murder, I felt that I was justified in imposing the maximum penalty provided by the law for larceny of the automobile and receiving part of the illegal proceeds of the robbery."

A maximum sentence such as this could all too easily have come to us, silent as to its motivating purpose, or couched in the beguiling language of indirection or hypocrisy; and it would have been, as a practical matter, immune to attack. Judge Sodaro, on the other hand, stated his position boldly. He did not mince words or soften impacts, but we have never said that that need be done. He was chagrined, as he had a right to be, at the verdict of the jury. He was nevertheless keenly aware of the parameters within which he was free to operate, and he measured his steps meticulously. We see no error.

<em>Judgments affirmed.</em>

*Davidson, J., concurring and dissenting:*

I agree with the majority that unauthorized use of an automobile is a lesser included offense in the greater crime of larceny of the automobile itself and that guilty verdicts on

both counts are not inconsistent and can be merged. Therefore, I concur in the majority's affirmance of appellant's conviction for larceny of the automobile. I also concur in the majority's affirmance of appellant's conviction for receipt of stolen goods. However, I disagree with the majority's view that this record establishes that Judge Sodaro, in sentencing, considered appellant's conduct before, during, and after the armed robbery and murder "only in terms of its aggravating effect upon the larceny" and regarded the murder and robbery "simply as conduct bearing upon the other two charges, thereby adding significantly to their gravity." Therefore, I dissent from the majority's holding that the trial judge did not err in this case in imposing the maximum sentences of fifteen years for larceny of the automobile and three years for the receipt of stolen goods.

In *Baker v. State*, 3 Md. App. 251, 256-57, 238 A. 2d 561, 565-66 (1968), this Court said:

"It is well settled that imposition of a sentence in a criminal case in this State is a matter peculiarly within the province of the trial judge who hears the case and sees the witnesses and the accused. The length of the sentence is therefore not ordinarily reviewable on appeal, if it is within the statutory limit and not dictated by passion, prejudice, ill will or any other unworthy motive. The sentencing judge may, of course, after verdict, inquire into the past criminal record of the defendant and hear evidence and receive reports in aggravation or mitigation of punishment; the inquiry of the judge is not limited by the strict rules of evidence and he is invested with wide discretion in determining the sentence to be imposed. In other words, to aid the sentencing judge in exercising this discretion intelligently, the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a

judge ought to have before him in determining the sentence that should be imposed, so that he may consider information obtained outside the courtroom and from persons whom the defendant has not been permitted to confront or cross-examine.

"But nothing in these rules immunizes the procedure pursuant to which an accused is sentenced after verdict from scrutiny under the due process clause of the Fourteenth Amendment to the Federal Constitution. So, in *Costello v. State, supra,* where it was contended that the procedure in the determination of the sentence violated due process of law, the court held at page 469 that such contention would be reviewable on appeal 'as an exception to the general principle.'" (Citations omitted.)

I believe that the sentencing procedure utilized in this case constitutes an exception to the general principle.

It is elemental that in our system of jurisprudence a sentencing judge can impose sentence only for offenses for which a person has been lawfully convicted. *Ruckle v. Warden, Maryland Penitentiary,* 335 F. 2d 336, 338 (4th Cir.), *cert. denied,* 379 U. S. 934, 85 S. Ct. 330 (1964); *Skinker v. State,* 239 Md. 234, 243, 210 A. 2d 716, 722 (1965); *Duppins v. State,* 17 Md. App. 464, 467, 302 A. 2d 717, 718-19 (1973); *Bartlett v. State,* 15 Md. App. 234, 241, 289 A. 2d 843, 846 (1972), *aff'd,* 267 Md. 530, 298 A. 2d 16 (1973). A sentencing judge overreaches the limits of his authority and power when he imposes a sentence upon an individual on the basis of his refusal to give information to a grand jury, *Heyward v. State,* 161 Md. 685, 696-97, 158 A. 897, 901 (1932), or his intention to file an appeal. *Mahoney v. State,* 13 Md. App. 105, 112-13, 281 A. 2d 421, 425-26 (1971), *cert. denied,* 264 Md. 750, *cert. denied,* 409 U. S. 978, 93 S. Ct. 306 (1972). A similar transgression occurs when sentence is imposed on the basis of an unwarranted assumption, bottomed on insufficient or on unreliable, inaccurate or false information that a person is guilty of offenses of which he was not lawfully convicted.

*Carroll v. State,* 19 Md. App. 179, 183-84, 310 A. 2d 161, 163 (1973); *Moore v. State,* 17 Md. App. 237, 241-42, 300 A. 2d 388, 390-91 (1973); *Towers v. Director,* 16 Md. App. 678, 681-82, 299 A. 2d 461, 464 (1973); *Baker v. State, supra,* 3 Md. App. at 258, 238 A. 2d at 566. In my view due process is equally offended when a judge imposes sentence on the basis of his determination that a person is guilty of offenses of which he was acquitted. *See United States v. Metz,* 470 F. 2d 1140, 1143 (3d Cir. 1972), *cert. denied,* 411 U.S. 919, 93 .S. Ct. 1558 (1973); *United States v. Eberhardt,* 417 F. 2d 1009, 1015 (4th Cir. 1969), *cert. denied,* 397 U. S. 909, 90 S. Ct. 907 (1970).

The scope of a sentencing judge's inquiry in imposing sentence is sufficiently broad to permit him to consider information concerning the convicted person's background and other, relevant matters, such as the gravity of the offense for which the person was convicted. While a sentencing judge's inquiry is not limited by the strict rules of evidence, and evidence of less probative value than is required for a determination of guilt may be considered, *Bartholomey v. State,* 267 Md. 175, 193-94, 297 A. 2d 696, 706 (1972), the judge may not consider evidence which possesses such a low degree of reliability that it raises a substantial possibility that his judgment may be influenced by inaccurate or false information. Consideration of such information leads to unwarranted assumption of guilt. For this reason it has been recognized that when they stand alone, bald accusations of criminal conduct for which a person either has not been tried or has been tried and acquitted may not be considered by the sentencing judge. *Purnell v. State,* 241 Md. 582, 584, 217 A. 2d 298, 299 (1966); *Walker v. State,* 186 Md. 440, 443, 47 A. 2d 47, 48 (1946); *Baker v. State, supra,* 3 Md. App. at 257-58, 238 A. 2d at 566.[1] However, in assessing such factors as the background

---

1. Other cases involving the same principle are legion. A judge may not consider evidence obtained outside a courtroom from persons whom the defendant has not been permitted to confront or cross-examine unless the information has been called to the defendant's attention and an opportunity afforded him to refute or discredit it. Driver v. State, 201 Md. 25, 32, 92 A. 2d 570, 573 (1952); Haynes v. State, 19 Md. App. 428, 433, 311 A. 2d 822, 825 (1973); Baker v. State, *supra.* Hearsay evidence in cases involving violations

of the individual and the gravity of the offense, sentencing judges are permitted to consider reliable evidence of conduct which may be opprobrious although not criminal, as well as the details and circumstances of criminal conduct for which the person has not been tried. *Purnell v. State, supra,* 241 Md. at 585, 217 A. 2d at 300; *see Brown v. State,* 11 Md. App. 27, 34, 272 A. 2d 659, 662, *cert. denied,* 261 Md. 722 (1971); *Turner v. State,* 5 Md. App. 332, 334-36, 247 A. 2d 412, 413-15 (1968). Because an acquittal does not have the effect of conclusively establishing the untruth of all of the evidence introduced against the defendant, *United States v. Sweig,* 454 F. 2d 181, 184 (2d Cir. 1972); *Bell alias Kimball v. State,* 57 Md. 108, 116-17 (1881), I am persuaded that for the same purposes a sentencing judge also may properly consider reliable evidence concerning the details and circumstances surrounding a criminal charge of which a person has been acquitted.

An acquittal does determine that a person is not guilty beyond a reasonable doubt of the crimes of which he was acquitted and this determination is conclusive on the issue of his guilt. *Slansky v. State,* 192 Md. 94, 108, 63 A. 2d 599, 605 (1949); *State v. Coblentz,* 169 Md. 159, 166-67, 180 A. 266, 269-70 (1935); *State v. Shields,* 49 Md. 301, 303-04 (1878); *see Turner v. Arkansas,* 407 U. S. 366, 368-70, 92 S. Ct. 2096, 2098-99 (1972); *Harris v. Washington,* 404 U. S. 55, 56, 92 S. Ct. 183, 184 (1971); *Ashe v. Swenson,* 397 U. S. 436, 446, 90 S. Ct. 1189, 1195-96 (1970). *See also Boblits v. State,* 7 Md. App. 391, 393-94, 256 A. 2d 187, 188-89 (1969), *cert. denied,* 256 Md. 743 (1970). Therefore, in my view, a sentencing judge may not consider even reliable evidence of the details and circumstances surrounding criminal conduct of which a person has been acquitted for the purpose of imposing

of the Controlled Dangerous Substances Act [Code (1957), Art. 27, § 298 (f)] may not be considered unless the credibility of the source and the underlying bases of the information are shown. Nickens and Rhodes v. State, 17 Md. App. 284, 289-90, 301 A. 2d 49, 52-53 (1973). Information based solely on mere rumor may not be considered. *See* Driver v. State, *supra,* 201 Md. at 34, 92 A. 2d at 574. Neither a conviction on appeal nor a conviction obtained against an accused at a time when he was unrepresented by counsel can be considered. Carroll v. State, *supra;* Moore v. State, *supra;* Towers v. State, *supra;* Gatewood v. State, 15 Md. App. 450, 459-62, 291 A. 2d 688, 693-94.

additional or enhanced punishment for the commission of those crimes. A determination of guilt beyond a reasonable doubt is a requisite condition precedent to the imposition of punishment. A sentencing judge cannot determine that an individual is guilty of a crime once a conclusive verdict of acquittal has been returned.

*Scott v. State,* 238 Md. 265, 276, 208 A. 2d 575, 581 (1965), does not compel a contrary result. The holding in *Scott,* that a trial judge properly may consider reliable evidence of criminal conduct of which a person has been acquitted, was strictly limited to revocation of probation proceedings and was further confined in its application to a situation in which the trial judge considered evidence of the alleged criminal conduct other than that considered by the jury.[2] The Court's conclusion there is bottomed on an express recognition of the unique nature of probation and of revocation of probation proceedings, which require nothing more than a determination that an agreement has been breached. A finding of criminal conduct is not required for such a determination, and, therefore, a finding of guilt beyond a reasonable doubt is not a prerequisite. *Scott* neither holds nor implies that when the purpose of a judge in a sentencing proceeding is to impose punishment for a crime, any standard less than that of proof beyond a reasonable doubt is applicable. Nor does it hold or imply that once a conclusive verdict of acquittal has been rendered by the jury, a sentencing judge can, upon the same evidence considered by the jury, determine that the accused was guilty of the crime charged and punish him for its commission. *Scott* stands only for the proposition that a trial judge is not bound by the verdict of a jury when he is considering reliable evidence of criminal conduct of which a

---

2. The majority states that in *Scott* a "jury acquitted the defendant there of certain criminal charges" and that "[n]otwithstanding that acquittal, [the trial judge] revoked probation upon the basis of the same evidence, which persuaded him that the criminal conduct had occurred." But the opinion in *Scott* sets forth in detail the repeated statements of the trial judge, all of which indicate that he was convinced of the defendant's guilt by critical identification evidence showing that a hat found at the scene of the crime belonged to the defendant. This evidence, while proffered by the State, was never admitted into evidence. It could not have been and was not, in fact, ever considered by the jury.

person has been acquitted for the purpose of taking an action which does not necessitate a finding of guilt of criminal conduct as a prerequisite.

Here when the trial judge passed sentence on appellant, he was of course in possession of the reliable evidence presented at the trial concerning the details and surrounding circumstances relating to the murder of Mr. Rubin and the armed robbery and assault of Mrs. Rubin. Appellant's theft of the automobile and his receipt of stolen goods were inextricably intertwined with those occurrences. In fixing sentence the trial judge was not obligated to ignore the evidence of these events which established among other things the consequences which resulted from the theft of the automobile and which led to the receipt of stolen goods. The consequences which flow from a given criminal act have evidentiary value in showing the gravity of the offense and, therefore, in determining the period of confinement required to effect the purposes of sentence.

However, the statements of the judge made prior to sentencing indicate that he disagreed with the verdict of the jury that appellant was not guilty of the murder, the armed robbery and the assault and that he considered appellant to be a motivating and active participant in the robbery, the assault and the ensuing murder. These statements, which were reinforced by his written comments at the time of the review of sentence, raise a substantial question in my mind as to whether the sentencing judge, in imposing the maximum sentences for the larceny and receipt of stolen goods convictions, believed that appellant, although acquitted of the murder, assault and armed robbery charges, was nevertheless guilty of those crimes and should be punished for their commission. If any part of the sentence is attributable to such impermissible considerations so that in effect the judge undertook to impose a penalty for the offenses of which appellant had been acquitted, appellant would have been denied due process of law in the sentencing process under the fourteenth amendment of the United States Constitution.

I agree with the majority that a maximum sentence such as here imposed easily could have come to us "silent as to its

318

motivating purpose, or couched in the beguiling language of indirection or hypocrisy; and it would have been, as a practical matter, immune to attack." But the simple fact here is that the maximum sentences imposed did not come to us in that posture. Instead they came to us with clear and reiterated articulation of the trial judge's belief that, notwithstanding the jury's verdict of acquittal, the very evidence considered by the jury established that appellant was guilty of murder, armed robbery and assault, the very crimes of which he had been acquitted. I believe that meticulous care is necessary at all times to assure the preservation of an accused's constitutional rights. Accordingly, I would remand this case for further consideration of the sentences so that the sentencing judge might determine whether the sentences should be reduced in the event that any part of the sentences was in fact attributable to an impermissible consideration.