# KELLY JAMES PIRNER v. STATE OF MARYLAND

[No. 696, September Term, 1979.]

*Decided February 14, 1980.*

The cause was argued before THOMPSON, WILNER and MACDANIEL, JJ.

*Thomas A. Pavlinic* for appellant.

*Paul T. Cuzmanes, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Robert C. Nalley, State's Attorney for Charles County,* and *Richard B. Starkey, Deputy State's Attorney for Charles County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

On the evening of June 24, 1978, someone broke into the County Prescription Shop, Inc., a drug store in Charles County, and stole a considerable amount of prescription drugs, some of which, as will be seen, were classified as controlled dangerous substances. Nearly four months later — on October 14, 1978, to be exact — officers of the Charles County Sheriff's Department, having some reason to believe that appellant was in possession of at least a part of the stolen drugs, arrested him and searched his automobile. Both the arrest and the search were without benefit of a warrant. In a duffel bag located under the carpet behind the passenger's seat of the car, the officers found 752 capsules of Darvon which, the record shows, had been taken from the County Prescription Shop, Inc., in the course of the June 24 breaking.

As a result of all this, appellant and a co-defendant were charged in a six-count indictment with various larceny and unlawful possession offenses. Following the denial of his motion to suppress the evidence seized from his automobile, appellant worked out a form of "plea agreement" with the State in which (1) he maintained his not guilty plea to all six counts, (2) the State agreed to proceed upon the third count only, all evidence to be by an agreed statement of facts, (3) the State would remain mute as to sentence, and (4) after sentencing on the third count, the State would *nol pros* the other five counts.[1] All of this was done; and, upon the statement of facts read into the record by the State's Attorney, appellant was convicted on the third count. After considering a pre-sentence investigation report, the court sentenced him to 90 days in the county jail.

In this appeal, appellant makes two claims: one, that the court erred in denying his suppression motion and, two, that the third count, in effect, failed to state a crime. Though arguing vigorously that the search was valid, the State has seen fit to confess error with respect to the second issue and has urged that we reverse the conviction on that account. It is

---

1. This procedure of maintaining a not guilty plea but proceeding on an agreed statement of facts is not truly a plea agreement within the meaning of Maryland Rule 733, although it has become a popular variation of or alternative to it. *See Gray v. State,* 38 Md. App. 343 (1977), *cert. den.* 282 Md. 732 (1978).

commendable for the Attorney General to confess error when he believes that a mistake affecting a citizen's life, liberty, or property has been made; and this is a proper case for such a confession. It seems, however, that he has confessed to the wrong error. In our judgment, the third count of the indictment does state a crime. It is the search that was improper, and it is for that reason that we must reverse the conviction.

### (1) *The Third Count*

Count three of the indictment charged appellant with the "unauthorized use" of the stolen prescription drugs in violation of Md. Ann. Code art. 27, § 349. Specifically, the count recited that appellant "against the will and consent of County Prescription Shop, Inc., a Maryland corporation, unlawfully did wilfully take and carry away: assorted prescriptive drugs and pharmaceutical products, to include containers of Darvon Compound 65 (propoxyphene hydrochloride), of the goods, chattels, monies and properties of County Prescription Shop, Inc. . . . contrary to Article 27, Section 349 of the Annotated Code of Maryland. . . ."

Article 27, § 349 states, in relevant part:

> "Any person . . . who shall enter, or being upon the premises of any other person . . . shall, against the will and consent of said person . . . wilfully take and carry away any horse, mare, colt, gelding, mule, ass, sheep, hog, ox or cow, or any carriage, wagon, buggy, cart . . . or any other vehicle including motor vehicle as defined in the laws of this State relating to such, *or property whatsoever,* or take and carry away out of the custody or use of any person . . . *any of the above-enumerated property* at whatsoever place the same may be found, shall upon conviction thereof . . . be adjudged guilty of a misdemeanor. . . ." (Emphasis supplied.)

Nowhere in the body of § 349 is the taking of prescription drugs specifically proscribed, yet that is what count three of the indictment charged, and that is what the evidence

showed appellant did. Appellant did not challenge the sufficiency of count three until after his conviction thereon pursuant to his "plea agreement"; indeed, he first raised the issue at his sentencing hearing. This is not fatal to his complaint here, however, for if § 349 does not apply to the taking of prescription drugs, count three, as written, fails to charge a crime. Such a defect would be jurisdictional in nature and could therefore be raised beyond the time otherwise required by Maryland Rule 736. *See Baker v. State,* 6 Md. App. 148 (1969); *Andresen v. State,* 24 Md. App. 128, 153 (1975), *cert. den.* 274 Md. 725, *aff'd* 427 U.S. 463.

The precise question at issue is whether the phrase "or property whatsoever," which would ordinarily include prescription drugs, is, by application of the doctrine of *ejusdem generis,* so limited to the types and classes of property particularized in the language preceding that phrase in the statute as to exclude anything else. Appellant and the Attorney General believe that it is; the court below thought otherwise.

Appellant's argument proceeds primarily from certain observations made by the Court of Appeals in *Wright v. Sas,* 187 Md. 507 (1947), and by this Court in *Robinson v. State,* 17 Md. App. 451 (1973), as to the nexus or relationship between § 349—an "unauthorized use" offense—and § 348, a much older larceny statute that was originally designed to deal with horse thieves. Both Courts have said that the two statutes are "closely related" (*Wright,* 187 Md. at 510) or that § 349 is "similar to" or "parallels" § 348 "in all respects." *Robinson,* 17 Md. App. at 456; *Henry v. State,* 20 Md. App. 296, 299 (1974). From these statements, and from the historical predicate offered for them, appellant suggests that the phrase "or property whatsoever" as it appears in § 349 cannot be given any broader meaning or effect than the particular types of personal property mentioned in § 348 or § 349.

As was determined in *Wright* and *Robinson,* § 348, in its original 1744 enactment by the Colonial Assembly, followed an even older common law practice of dealing more severely

with horse thieves than with purloiners of other types of personalty. A convicted horse thief, both in England and under the 1744 statute, was denied benefit of clergy, making death on the gallows a virtual certainty. Over the years, however, the Legislature amended the statute in two significant respects: it expanded the scope of the enactment to include within it the theft of other types of animals than horses and it reduced, both absolutely and comparatively, the severity of the punishment. As of 1880, the statute, then codified as § 47 of art. 72 (1878 Code):

(1) applied to the felonious stealing of a horse, mare, gelding, colt, ass, or mule; and

(2) in addition to requiring restoration of the animal, subjected the offender to imprisonment for two to fourteen years. The penalty for grand larceny generally (§ 38) was restoration plus imprisonment for one to fifteen years — not a whole lot of difference.

According to the Journal of the House of Delegates (1880 Session), § 349 originated from an order adopted on February 25, 1880, granting leave to the House Judiciary Committee to introduce a bill entitled "an Act to add an additional section to Article 30, of the Code of Public General Laws, to prevent dog-stealing." [2] It does not appear that a bill dealing with dog stealing was ever introduced, however. What was submitted by the Judiciary Committee and read for the first time on March 2, 1880, was "A bill entitled an Act to add an additional section to Article 30, of the Code of Public General Laws, entitled 'Crimes and Punishments.' " This bill, which was to pass the House without amendment, made it a misdemeanor to enter the premises of another person and, against the will and consent of that person, to take away a *"horse, mare, colt, gelding, mule, ass, ox, or cow, or any carriage, wagon, buggy, cart, or any other vehicle or property whatsoever."* (Emphasis supplied.)

---

**2.** *See* House Journal, pp. 441, 1505. Article 30 was the criminal law under the 1860 Code. The 1878 Code moved the criminal code to art. 72, but for some reason bills in the 1880 session continued to refer to art. 30.

The Senate added a number of amendments to the bill, one of which was the inclusion of sheep and hogs in the list of animals covered. *See* Senate Journal (1880), pp. 573, 574. The House concurred in the Senate amendments, and that is how the bill passed and became law as Chapter 164, Acts of 1880. As enacted, the bill was considerably broader in scope than the 1744 horse-stealing law as then current. It was not restricted to animals, for one thing, but included all manner of carts and vehicles — *i.e.,* inanimate objects; and it also expanded the list of animals to include oxen, cows, sheep, and hogs. These, of course, were not animals normally used for human transportation, as were all of the animals included in the 1744 statute; their use was as livestock or, in the case of oxen, as work animals.

It is thus clear that, although the two laws (or offenses) were closely related and parallel in *some* respects, the distinction between them was greater than merely the requirement in one of *animus furandi* (although that was, of course, itself a most important difference). The broader scope of the newer act has remained intact since its adoption. Indeed, the only significant change to either statute that is relevant to this case came in 1918 when the General Assembly added "motor vehicle as defined in the laws of this State" to *both* provisions. *See* Laws of Md., 1918, ch. 422. This was clearly a substantive addition with respect to the larceny statute (§ 348); as to § 349, the Court of Appeals noted in *Wright v. Sas, supra,* 187 Md. at 511:

"Perhaps the amendment was not necessary [in § 349] which already covered 'any carriage, wagon, buggy, cart or any other vehicle * * * or property whatsoever.' Apparently it was thought or feared that, by reason of the association of vehicles (all horsedrawn or ox-drawn, in 1880) with horses, 'vehicle' might not include a subsequently invented 'horseless carriage.' . . . ."

It is in this context that we consider the application of *ejusdem generis.* Preliminarily, it is important to note that *Wright, Robinson,* and *Henry* all involved the taking of vehi-

cles, and were therefore clearly within the statutory purview of both § 348 and § 349. The comments made in those cases as to the relationship between the two statutes must therefore be considered in that context.[3] Neither in those cases, nor in any other brought to our attention, has the Court of Appeals or this Court ever concluded (or even suggested) that the phrase "or property whatsoever" in § 349 does not mean precisely what it says.

The doctrine of *ejusdem generis* has been most commonly stated as follows: Where general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned. "This rule is based on the supposition that if the Legislature had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things." *See Smith v. Higinbothom,* 187 Md. 115, 130 (1946); 82 C.J.S. *Statutes,* § 332b (p. 658). This rule or doctrine is not absolute, however. As the Court further observed in *Blake v. State,* 210 Md. 459, 462 (1956):

> "The rule of *ejusdem generis,* however, is merely a rule of construction, and cannot be invoked to restrict the meaning of words within narrower limits than the statute intends, so as to subvert its obvious purpose."

In *American Ice Co. v. Fitzhugh,* 128 Md. 382, 388 (1916), the Court quoted with obvious approval this statement from *National Bank of Commerce v. Ripley,* 161 Mo. 126, 61 S.W. 587 (1901):

> "* * * But this [*ejusdem generis*] is only a rule of construction to aid us in arriving at the real legisla-

---

**3.** *Wright v. Sas* involved the question of whether § 349 (then § 397) was repealed by implication as an inconsistent law by the enactment of a new motor vehicle code in 1943. The focus of the Court was on the relationship between § 397 and a similar provision in the motor vehicle code. *Robinson* concerned a leased automobile, the question being whether a provision in the lease prohibiting the lessee from allowing anyone else to drive the car necessarily made a use of it by anyone else, however permissive, a violation

tive intent. It is not a cast-iron rule, it does not override all other rules of construction, and it is never applied to defeat the real purpose of the statute, as that purpose may be gathered from the whole instrument. It is a corollary to the first proposition above stated, that the statute must be construed to give effect to all its words. The rule itself must not be so construed as to defeat that purpose. Whilst it is aimed to preserve a meaning for the particular words, it is not intended to render meaningless the general words. *Therefore, where the particular words exhaust the class, the general words must be construed as embracing something outside of that class.* If the particular words exhaust the *genus* there is nothing *ejusdem generis* left, and in such case we must give the general words a meaning outside of the class indicated by the particular words or we must say that they are meaningless, and thereby sacrifice the general to preserve the particular words. In that case the rule would defeat its own purpose." (Emphasis supplied.)

The italicized statement was quoted again in *Blake, supra,* 210 Md. at 462, the Court there ascribing it to *American Ice Co.* rather than to the Missouri case. *See also* 82 C.J.S. *Statutes,* at p. 665: "The rule does not apply where its application would render meaningless the general words, as where the specific words exhaust or embrace all objects of their class, so that the general words must bear a different meaning from the specific words or be meaningless. . . ."

In light of this constraint, a mere reading of the two statutes makes clear the fallacy of appellant's argument. What should the phrase "or property whatsoever" be limited to? To what is included in § 348? To do that would require that we ignore the deliberate inclusion of specific categories in § 349 that never were in § 348 — oxen, cows, sheep, hogs, carriages, wagons, buggies, carts, vehicles other than motor

---

of § 349. *Henry* dealt with whether §§ 348 and 349 were mergeable or inconsistent offenses.

vehicles. No, it is clear that, even in the specific enumeration, § 349 was intended to include a broader range of items than § 348. What then: to animals? That would ignore the specific inclusion of inanimate means of locomotion in § 349. Perhaps then to means of locomotion. Wrong again; that would not only overlook the inclusion (by specific amendment) of sheep and cows, which are not means of locomotion, but the fact that all such means of locomotion are already included through the enumeration of all manner of vehicles.

Illuminating as this micro-analysis is, it but illustrates that the Legislature did indeed convey an intent to cover within this "unauthorized use" statute a good bit more than what was included in the horse-stealing statute. And there was good reason for it to do so. As was pointed out in both *Wright* and *Robinson,* the real significance of § 349 was to eliminate the element of *animus furandi* from what otherwise was a larceny offense. It is not illogical, then, for the 1880 Legislature to have wanted this new offense to apply to the unauthorized taking of all property to which the existing larceny statutes applied, mentioning specifically certain types of animals and vehicles only because of their special economic importance at the time.

Keeping in mind that *ejusdem generis* is but a rule of construction, and that the overriding imperative in all cases is to construe a statute reasonably so as to effectuate the intent of its enactor, it is plain that the general phrase "or property whatsoever" cannot be limited in the manner that appellant and the Attorney General suggest. To do so would be to render the phrase meaningless and thus thwart a rather obvious legislative intent to include property other than animals and vehicles. There being nothing in the plain meaning of the statutory phrase, or in the legislative history, to indicate a desire to exclude a broader range of property, we believe that the doctrine of *ejusdem generis* as espoused by the parties here, is inapplicable. Section 349 does include a proscription against the unauthorized taking of prescription drugs. Count three of the indictment did, therefore, charge a crime, and the evidence sufficed to sustain appellant's conviction of it.

## (2) *Validity of the Search*

The arrest and search in question occurred at about 2:00 p.m. on October 14, 1978. At some point before then — within a week or two — one Charles Holmes contacted Officer Joseph Stine, of the county sheriff's department, and advised him that appellant was dealing in drugs. Holmes said that he had heard from appellant that appellant had been involved in the drug store breaking and that he (appellant) had some Darvon and Librium that he wanted to sell. No immediate action was taken as a result of this initial contact.

At about 11:30 a.m. on October 14, Holmes called Stine again and told him that appellant had called and again offered to sell some Darvon. Stine told Holmes to set up a location and to let him know. Holmes called back later and told Stine that appellant would be at a particular restaurant at 2:00 that afternoon. He also told Stine, at some point, that appellant would be driving a red Datsun 280Z with temporary tags and an antenna.[4] Stine met with Holmes about 12:30 p.m., fitted him with a voice transmitter, and arranged to meet him (or took him) to the restaurant shortly before 2:00.

Holmes was placed inside the restaurant — a fast food place — while Stine and other officers waited in a car across the street. At about the appointed hour, Stine heard Holmes say "here he comes in his 280Z, antenna and all." He looked up and observed a red Datsun 280Z with an antenna turn into the restaurant parking lot. Two people were in the car, the driver being a woman. Stine heard Holmes ask, "Do you have the stuff?", to which a male voice replied, "Yes, let's go around to the other side." The Datsun then proceeded to the other side of the building and Holmes said, "Now is your chance." Stine and his colleagues then closed in, blocked the Datsun, arrested its passengers, and removed them from the car.

Stine and a fellow officer then commenced to search the car. Underneath the carpet behind the passenger's seat, the other officer discovered a white canvas duffel bag, to which he called Stine's attention. Suspecting that the "dope" was in the

4. Although the record is not entirely clear on this, it appears that the antenna mentioned was something other than a normal aerial for a car radio.

duffel bag, Stine immediately opened it, looked inside, and had his suspicions fully confirmed.

The thrust of appellant's challenge to the evidence seized was that the *automobile* search was unlawful. His contention was that Holmes, the informant, had not been shown to be sufficiently reliable or to have a sufficient basis of knowledge to give Officer Stine probable cause to search the vehicle. As to this, we disagree. Although, as Officer Stine himself conceded, the information supplied by Holmes, standing alone, would not have sufficed to constitute probable cause, the deficiency was cured when he saw the red Datsun appear as Holmes said it would, and heard the drug sale about to be consummated, as Holmes said it would be.[5]

At issue with respect to the *automobile* search is the admixture of principles announced by the Supreme Court in *Carroll v. United States,* 267 U.S. 132 (1925), *Aguilar v. Texas,* 378 U.S. 108 (1964), and *Spinelli v. United States,* 393 U.S. 410 (1969), which we synopsized in *Jarrell v. State,* 36 Md. App. 371, 373 (1977), as follows:

> "In order to justify the warrantless search of the appellant's automobile, under the so-called automobile exception, *Carroll v. United States,* 267 U.S. 132 (1925), probable cause and exigent circumstances must be established. *Soles v. State,* 16 Md. App. 656 (1973). In addition, when using an informant to show probable cause, such as here, it must be demonstrated that he was credible, his informa-

---

5. Appellant contends that Stine's interception of the conversation he had with Holmes was unlawful, and should therefore be disregarded in determining the existence of probable cause. He bases this argument on the supposition that Darvon is not a controlled dangerous substance, and that the interception was therefore not authorized under Courts article, § 10-402 (c) (2). But the drug (propoxyphene hydrochloride) whose trade name is Darvon is a Schedule IV controlled dangerous substance under Federal law (*see* 21 CFR § 1308.14 (f); 42 FR 8636 (2/11/77)), and thus, by virtue of Md. Ann. Code art. 27, § 278 (c), is also a controlled dangerous substance under State law. *See Samson v. State,* 27 Md. App. 326, 333 (1975). Given the circumstances here, the interception was permissible under § 10-402 (c) (2), and the comments overheard through the transmitter may therefore be weighed in determining whether Stine possessed that quantum of reasonable suspicion necessary to constitute probable cause.

tion reliable, and he possessed a sufficient basis of knowledge [citing *Aguilar* and *Spinelli*].

"An informant's credibility can be established by showing receipt of *present* or past reliable information. *Stanley v. State,* 19 Md. App. 507, *cert. denied,* 271 Md. 745 (1974). . . ." (Emphasis supplied.)

It is unimportant, in this case, that Holmes had not established his credibility in the past; his *present* credibility was established by events unfolding before the officer's own eyes and ears. When an informant, based upon his own personal knowledge, states that a specific unlawful act is going to occur at a particular time and place, and a police officer, forewarned, sees and hears the event about to take place precisely as the informant said it would, it is specious to suggest that the informant has not been shown to be credible, or that his information is not reliable.

Given the totality of the information available to Officer Stine, we believe that he did have probable cause to arrest appellant and to search the car. What he did *not* have authority to do, however, is to search the white duffel bag that he found in the car; and it is for *that* reason that the evidence seized was inadmissible and the conviction must be reversed.

In fairness to Officer Stine, he made the search eight months before the Supreme Court definitively said he should not have done so.

The court gave a strong indication in *United States v. Chadwick,* 433 U.S. 1 (1977), that the so-called "automobile exception" first enunciated in *Carroll v. United States, supra,* 267 U.S. 132, would not routinely permit the search of luggage and luggage-type containers merely because they were located in an automobile that itself was properly subject to search. To the extent there was any doubt on that point because of the particular facts of *Chadwick,* the Supreme Court appears to have cleared it up quite well in *Arkansas v. Sanders,* 442 U.S. 753, 99 S. Ct. 2586 (1979). Observing that once the piece of luggage is physically seized and removed from both the vehicle and the arrestee's dominion the

"exigency of mobility" with respect to it is lost, the Court concluded (99 S. Ct. at 2594):

> "In sum, we hold that the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to such luggage in other locations. Thus, insofar as the police are entitled to search such luggage without a warrant, their actions must be justified under some exception to the warrant requirement other than that applicable to automobiles stopped on the highway. Where — as in the present case — the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained. In this way, constitutional rights of suspects to prior judicial review of searches will be fully protected."

In a footnote (No. 13, 99 S. Ct. at 2593), the Court stated that not all containers and packages would be so protected, mentioning those containers which "by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." But, subject to special circumstances not present here,[6] it made clear that its protective rule would apply to personal hand luggage; and there is nothing in this case to suggest that the duffel bag in question would not fall squarely into that category of item. *See United States v. Meier,* 602 F.2d 253 (10th Cir. 1979), holding *Sanders* applicable to a "backpack"; *also United States v. Gooch,* 603 F.2d 122 (10th Cir. 1979), involving a briefcase. *See also Shingleton v. State,* 39 Md. App. 527, 539 (1978), decided under *Chadwick,* and *cf. Dawson v. State,* 40 Md. App. 640 (1978).

---

**6.** In footnotes 11 and 12 (99 S. Ct. at 2593), the Court noted a number of special conditions and circumstances in which warrantless luggage searches may be permissible: "special exigencies" dependent upon the probable content of the luggage and the suspect's access to it; searches incident to an arrest, requiring, of course, that the item be within the arrestee's "immediate control"; border searches under *United States v. Ramsey,* 431 U.S. 606 (1977).

The State has not attempted to justify the search of the duffel bag as one conducted incident to the arrest; nor, from the facts in this record, could it legitimately do so. We thus have almost precisely the situation described by the Supreme Court in footnote 12 of *Sanders,* 99 S. Ct. at 2593:

"It is beyond question that the police easily could have obtained a warrant to search respondent's bag if they had taken the suitcase to a magistrate. They had probable cause to believe not only that respondent was carrying marijuana [read: Darvon], but also that the contraband was contained in the suitcase that they seized. The State argues that under the circumstances of this case inconvenience to all concerned would have been the only result of deferring search of the suitcase until a warrant was obtained. Those in respondent's position who find such inconvenience unacceptable may avoid it simply by consenting to the search."

Because of the unlawful search of the duffel bag, the evidence seized from it was inadmissible.

*Judgment reversed; Charles County*
*to pay the costs.*